The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

Charles John CZEMERYNSKI, Defendant–Appellant.

No. 88SA280.

Supreme Court of Colorado, En Banc.

Feb. 12, 1990.

Rehearing Denied March 5, 1990.

1102

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., John Milton Hutchins, First Asst. Atty. Gen., and Guy Till, Asst. Atty. Gen., Denver, for plaintiff-appellee.

Ralph Ogden, Wilcox and Ogden, Denver, for defendant-appellant.

Justice MULLARKEY delivered the Opinion of the Court.

This is an appeal from the Larimer County District Court's conviction of Charles Czemerynski for criminal extortion and harassment under sections 18–3–207(1) and 18–9–111, 8B C.R.S. (1986). Because Czemerynski raised several constitutional issues, the case was transferred to this court from the court of appeals. § 13–4–102(1)(b), 6A C.R.S. (1987). We affirm Czemerynski's convictions.

## I.

Czemerynski was convicted of harassment and criminal extortion based on alleged threatening phone calls made to Rhonda Camerrer between April 1, 1984 and July 31, 1984. He received concurrent sentences of six years on the extortion conviction and six months on the harassment conviction.

In February of 1984, members of the Camerrer family began receiving hundreds of anonymous obscene[1] telephone calls which continued until December of 1985. The calls were mostly for the Camerrers' daughter, Rhonda, and came several times a day, "seven days a week." Kerry Jean Camerrer, Rhonda's mother, was convinced

that it was the same voice every time. The caller usually requested that Rhonda "talk dirty" to him, and he often said "if you don't help me, I'm around the corner and I know where you live, and I'm going to come and get you." Occasionally the caller identified himself as John Robinson.

On April 10, 1985 a call was made to the Camerrer residence during which the caller identified himself as Chuck Czemerynski and said that he was calling from the prison at Canon City, that he wanted to get to know Rhonda, and that he would write her a letter. He also admitted that he was "the one that's been making the phone calls."

A letter addressed to Rhonda was received a few days later which was signed "Chuck Czemerynski." Neither the April 10 call nor the letter was obscene in any way. Afterwards, the calls became less frequent although the same vague threats to "get" Rhonda were made.

Another witness, Beverly Swenson, was allowed to testify over defense objection. Swenson had met Czemerynski at least once and had talked with him several times between April 1, 1984 and July 31, 1984, when he came to her home to call for her daughter. After her daughter and Czemerynski had a disagreement, the Swensons began receiving hundreds of obscene phone calls. The caller used graphic sexual language and wanted the daughter to "talk dirty" to him. Furthermore, the caller often said that he was watching every move they made and that if they didn't do what he said, he would rape and kill them. On one occasion, the caller identified himself as "Johnny Robbins" but never identified himself in any other way. Swenson suspected that the caller was Czemerynski, and one time she gave the phone to her daughter who said "That's Chuck. Just hang up."

At trial, Swenson was allowed to testify that her daughter had identified the ob-

---

1. Both parties describe the telephone calls as obscene calls and we have used the same termi- nology.

scene caller as Charles Czemerynski. Also, Swenson was allowed to testify about a series of obscene and threatening phone calls allegedly made by the defendant. The testimony concerning these calls was offered to help identify the defendant as the person who called the Camerrers by showing an allegedly common plan, scheme, design, and intent.

## II.

Czemerynski claims that he was denied his Sixth Amendment right to conflict-free representation by trial counsel. Czemerynski was represented at trial by State Deputy Public Defenders Joseph Gavaldon and Lee Medina. Medina, who previously had represented Czemerynski on other felony charges in 1984, was not involved in the preparation for trial but was asked to assist Gavaldon at the trial. On the first day of trial, Medina examined the list of prospective witnesses and suspected that he previously had represented Beverly Swenson, an endorsed prosecution witness, in an unrelated criminal matter. A review of the Public Defender's files revealed that Medina represented Swenson on a felony theft charge in 1984. Swenson pled guilty to the charge and received a deferred sentence for a period of two years. At the time of this trial, the deferral period had not expired.

After determining that Medina had represented Swenson, Gavaldon and Medina disclosed that fact to the defendant, the prosecution and the court:

MR. GAVALDON: We have determined that this particular witness has been represented by our office, and in fact Mr. Medina, after yesterday when we were talking about this particular case, the name was somewhat familiar, so we asked our investigator to check if in fact—and we checked with the Court records in the District Court records, and

it does appear that Mr. Medina represented [Mrs.] Swenson with regard to a matter totally unrelated to this case obviously, but involving a disposition whereby the District Attorney and our office, along with [Mrs.] Swenson, entered into a deferred sentence on a felony.

Gavaldon added that "we are not asking to be removed from this case whatsoever."

The record discloses that both the prosecutor and the defense counsel recognized that an actual conflict of interest would be created by the Public Defender's continued representation of the defendant because the Public Defender would be required to cross-examine a former client who was a key prosecution witness. The court attempted to minimize the conflict by prohibiting Medina from assisting Gavaldon in Swenson's cross-examination and by prohibiting Medina from disclosing any information about Swenson which was not a matter of public record.[2]

Absent the conflict of interest, the Public Defender would not have been so restricted in developing the cross-examination of Swenson. Defense counsel would have been free to attempt to impeach Swenson with any and all relevant information including her prior criminal record and other matters affecting her credibility. The extent to which the defense's cross-examination of Swenson actually was impaired is known only to Medina, Swenson's former attorney, who was precluded from disclosing such information to anyone.

■ In this case, however, the defendant waived his right to conflict-free representation. The district attorney asked the trial judge to advise the defendant of the potential conflict of interest and to determine whether he waived his right to conflict-free representation. Czemerynski had been present throughout the discussion between counsel and the trial court regarding the potential conflict of interest. The judge

---

**2.** Precautionary measures to ensure against conflicts of interest are discussed in Justice Marshall's dissent in *Wheat v. United States*, 486 U.S. 153, 108 S.Ct. 1692, 1703, 100 L.Ed.2d 140 (1988).

explained to the defendant that Medina previously had represented a potential witness on a different legal matter and he described the proposed procedure for cross-examining Swenson. In response to the court's questioning, Czemerynski stated that he understood the previous discussion between the court and counsel and the proposed procedure. The court then asked Czemerynski if he wanted Gavaldon and Medina to continue representing him and he responded affirmatively. The judge also asked Czemerynski if he had any questions or needed more time to talk with his attorneys. Czemerynski had no questions for the court and indicated that he did not need to discuss the matter further with his attorneys.

The case proceeded to trial and at no time did Czemerynski object to his representation by the two Public Defenders. Swenson testified and her cross-examination followed the procedure ordered by the court with Gavaldon cross-examining her while Medina remained seated at the defense counsel table. From the record, Gavaldon's cross-examination appears adequate. He brought out Swenson's felony conviction as a result of her guilty plea and Czemerynski does not argue that Gavaldon should have pursued any other line of questioning to impeach Swenson's testimony.

■ Although Czemerynski concedes that generally a defendant may waive his right to conflict-free representation, he argues that public policy should prohibit the cross-examination of Swenson by her former attorney, the Public Defender. In *Rodriguez v. District Court*, 719 P.2d 699 (Colo.1986), we recognized a defendant's right to waive conflict-free representation by the Public Defender where the Public Defender previously had represented a key prosecution witness. Different deputy public defenders simultaneously represented the defendant Rodriguez and the witness in different cases until the Public Defender withdrew from representing the witness after she indicated her intent to testify against Rodriguez. In concluding that

Rodriguez could waive the conflict, we noted that the witness did not object to the Public Defender's representation of Rodriguez and that it appeared that the conflict of interest would be "of relatively minor significance at trial" because the witness could be impeached with sources entirely independent of any confidential communications which she had made. *Id.* at 707. We concluded that "the public's interest in ensuring that potential witnesses may freely communicate with counsel secure in the knowledge that privileged matter cannot subsequently be revealed is protected by the fact that the [trial court] can monitor the interrogation of [the prosecution witness] at trial and by the fact that much of the information obtained by the Public Defender to aid in the cross-examination of [the prosecution witness] may not be privileged." *Id.* at 708.

Many of the same considerations are present here and served to protect Swenson. In addition, the case for waiver is stronger because the Public Defender's representation of Swenson occurred in an unrelated case two years before this trial. As the defendant concedes, the Public Defender took adequate precautions to prevent the disclosure of Swenson's closed case file to the attorneys trying this case. As in *Rodriguez*, the trial court was available to protect Swenson's interest and did so. Her cross-examination was limited to matters of record regarding her guilty plea and deferred sentence. Thus, the public policy concern identified by the defendant did not prohibit his waiver of his right to conflict-free representation.

Czemerynski also contends that his waiver was invalid because the nature of the conflict of interest and its potential effect on him were not explained adequately to him. He argues that the language used by his counsel and the court was too technical and that both denigrated the significance of the potential conflict.

■ The record must show that the defendant understandingly waived his right to conflict-free representation. *Rodriguez,*

719 P.2d at 708; *People v. Castro*, 657 P.2d 932, 945–946 (Colo.1983). We have said that such a waiver is valid "if the prosecution establishes that the defendant was aware of the conflict and its likely effect on the attorney's ability to offer effective representation and that the defendant thereafter voluntarily, knowingly and intelligently relinquished his right to conflict-free representation." *People v. Castro*, 657 P.2d at 945–946. Relying on statements in *Rodriguez*, 719 P.2d at 708, and *Castro*, 657 P.2d at 946 n. 10, Czemerynski argues that his waiver was not understandingly made because plain language was not used to communicate with him.

■ Contrary to the defendant's contention, the court and counsel used appropriate language to advise him. In the context of guilty plea advisements, we have recognized that a reading of the charge may suffice if it is readily comprehended by a reasonable person. *People v. Cabral*, 698 P.2d 234, 236 (Colo.1985); *People v. Muniz*, 667 P.2d 1377 (Colo.1983). Our preference for plain English does not mean that a trial court is required to avoid all use of legal terms when advising a defendant.

■ Here, the nature of the potential conflict and how to handle it were discussed extensively during the morning *in camera* hearing. Because Swenson testified at the same hearing, the content of her testimony and the proposed scope of her cross-examination were presented clearly to the defendant. The defendant was able to consider the matter; his waiver was not taken until court resumed in the afternoon. At no time did Czemerynski indicate that he did not understand the proceedings. While the record might have been more fully developed on the waiver issue, it is adequate for us to conclude that the defendant understandingly waived his right to conflict-free representation.

### III.

■ Czemerynski also argues that the district court erred in allowing Beverly Swenson to testify that her daughter had identified the obscene phone caller as Czemerynski. At trial Swenson testified that her daughter had applied for a job at the same company where Czemerynski worked. Czemerynski had come to the Swensons' home on at least one occasion to talk with their daughter and Swenson had met him personally and talked to him several times. After Czemerynski and the daughter had a "falling out," the Swensons began receiving obscene and threatening phone calls.

During the direct examination, Swenson testified to the following:

Q: When the calls, the obscene calls, first started, did you ever have occasion when you were receiving one of these calls to hand the phone to your daughter?

A: Yes. There was maybe one or two phone calls, and then she was present, and I handed the phone to her, and she identified the voice.

Q: Okay.

A: Definitely. I mean, I had suspected, but I didn't know for sure.

Q: When you gave her the phone to listen?

A: Yes.

Q: —Would you tell us what she said?

A: She says, "That's Chuck, just hang up."

Q: And you've indicated that the voice, it sounded similar to you?

A: Yes, it had sounded similar.

Q: And did it sound similar to whom?

A: To Chuck, that I'd talked to a person before.

Prior to her testimony, counsel and the court discussed, out of the presence of the jury, the content of Swenson's testimony. The defense objected to her identification of Czemerynski through her daughter's statement, claiming that the statement was hearsay and would be prejudicial to Czemerynski. The trial judge overruled this objection and held that the hearsay identifica-

tion would be admissible pursuant to C.R.E. 803(1) and possibly pursuant to C.R.E. 803(2) as well.

We agree that the hearsay statement of the daughter's identification of the caller's voice was admissible as an exception to the hearsay rule under C.R.E. 803(1). Generally, an out-of-court statement offered in evidence to prove the truth of the matter asserted is not admissible unless it falls within one of the statutory exceptions to the hearsay rule. *Fernandez v. People,* 176 Colo. 346, 353, 490 P.2d 690, 693 (1971). Spontaneous or present sense impressions are admissible despite the availability of the declarant under C.R.E. 803(1) which states that "[a] spontaneous statement describing or explaining an event or condition made while the declarant was perceiving the event or condition" is not excluded by the hearsay rule. C.R.E. 803(1) is more restrictive than the relevant Federal Rule of Evidence 803(1) which treats as a present sense impression a description made immediately after perception. The federal rule differs in that it does not include the contemporaneous requirement of the Colorado rule. J. Quinn, *Hearsay in Criminal Cases under the Colorado Rules of Evidence,* 50 U.Colo.L.Rev. 277, 313 (1979).

The Committee Comment to the Colorado rule provides further guidance: "Colorado case law requires that a present sense impression be instinctive and spontaneous in order to be admissible ... spontaneity is the most important factor governing trustworthiness. This is especially true when there is no provision that the declarant be unavailable as a witness." *See Denver City Tramway Co. v. Brumley,* 51 Colo. 251, 116 P. 1051 (1911); *People v. Jones,* 665 P.2d 127 (Colo.Ct.App.1982), *aff'd,* 681 P.2d 504 (Colo.1984).

On at least one occasion Swenson handed her daughter the phone while the caller was making obscene comments and the daughter said, "That's Chuck, just hang up" immediately after perceiving the voice. This statement satisfies the spontaneous and contemporaneous requirement of Rule 803(1). Thus, according to the rule, it is immaterial whether or not the daughter was available at trial.

■ The defendant also argues that, even if the daughter's statement satisfies the hearsay exception, the statement is inadmissible because it violates the defendant's right to confront the witness against him. U.S. Const. amend. VI; Colo. Const. art. II, §'16. The defendant did not raise this argument at trial or in his opening brief. Rather, the confrontation issue was raised for the first time in the defendant's reply brief and, accordingly, the prosecution did not brief the issue. Under these circumstances, the issue is not properly before us and we will not address it. 9 Wright and Miller, *Federal Practice and Procedure* § 3974 (1977) (Issues not raised in appellant's initial brief will normally not be considered by the court.). *See Snider v. Town of Platteville,* 75 Colo. 589, 227 P. 548 (1924); *Zink v. Fry,* 72 Colo. 42, 209 P. 510 (1922); *Davis v. Pursel,* 55 Colo. 287, 134 P. 107 (1913) (Issues not raised in an appellant's original brief will not be considered when raised for the first time in the reply brief.).

## IV.

The evidence at trial showed that the harassing telephone calls were made to both the Camerrer home and the Swenson home from a specific Larimer County detention center telephone to which the defendant had access. Telephone records showed that the telephone calls from that number to the Camerrer and the Swenson homes were frequent and occurred within minutes of each other. Furthermore, Rhonda Camerrer and Swenson gave similar descriptions of the calls and of the caller's language and threats.

The defendant challenges two of the trial court's evidentiary rulings which admitted evidence of the telephone calls to the Camerrer and Swenson households. We address each in turn.

## A.

Czemerynski argues that it was improper for the court to allow Swenson to testify about other obscene or threatening phone calls allegedly made by him. He argues that the admission of this testimony was redundant since it was related to the proof of identity and that other evidence already admitted was sufficient to prove identity. Also, he asserts that the probative value of the evidence was heavily outweighed by its prejudicial impact.

At trial, the evidence of similar phone calls made to the Swenson residence was admitted pursuant to C.R.E. 404(b) which states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Swenson's testimony concerned conduct which was similar in nature but wholly independent from the offense charged. The prosecution stated that it was offering Swenson's testimony to prove identity, common scheme, plan, design, and intent. *See People v. Ray*, 626 P.2d 167, 171 (1981); *People v. Jackson*, 627 P.2d 741, 744 (Colo. 1981) (evidence of other crimes is inadmissible to prove the accused has a propensity to commit the crime which is charged; it may be admissible if offered for a valid purpose, for example, to show scheme, plan, design or intent).

▮▮▮ We have limited the admission of evidence of other crimes by requiring a showing of a nexus between the offense for which the defendant is presently charged and other criminal acts or conduct. *Stull v. People*, 140 Colo. 278, 344 P.2d 455 (1959). *See also People v. Jackson*, 627 P.2d at 744. When admitting evidence of prior criminal transactions, a trial court must strictly adhere to the procedural pro-

tections announced in *Stull* and *People v. Honey*, 198 Colo. 64, 596 P.2d 751 (1979).

The record shows that the trial court followed the *Stull* and *Honey* guidelines and gave the jury an appropriate instruction as to the limited purpose for which the evidence was received. Swenson's testimony first was presented at an *in camera* hearing, following which the trial judge determined that the evidence was being offered for a valid purpose that would assist the jury in terms of identity, plan, and scheme. Also, the trial judge concluded that the evidence was relevant to a material issue and that the probative value outweighed its prejudice.

▮▮▮ It is within the "special province and competence of the trial court to determine the relevancy of evidence at trial." *People v. Bynum*, 192 Colo. 60, 62, 556 P.2d 469, 471 (1976). Evidence is "relevant when it tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401. Furthermore, the Colorado Rules of Evidence strongly favor the admission of proffered evidence when it is material and satisfies the probability standard of CRE 401. *King v. People*, 785 P.2d 596, 603 n. 7 (Colo.1990). *See also People v. Lowe*, 660 P.2d 1261, 1264 (Colo.1983).

▮▮▮ A determination that the probative value of evidence outweighs prejudice to the defendant is left to the discretion of the trial court and will not be overturned on appeal in the absence of an abuse of discretion. *King* at 603. *See also People v. Ihme*, 187 Colo. 48, 528 P.2d 380 (1974) (trial judge is allowed substantial discretion when deciding admissibility of prior criminal activity). Furthermore, a reviewing court will conclude that the trial court abused its discretion only if it finds that the trial court's evidentiary ruling was "manifestly arbitrary, unreasonable, or unfair." *King* at 603. We conclude that the trial court did not abuse its discretion by admitting into evidence Swenson's testimo-

ny of prior telephone calls allegedly made by the defendant.

### B.

Next we are asked to determine whether Czemerynski was unduly prejudiced because the trial court allowed the jury to hear testimony concerning hundreds of other calls allegedly made by him to the Camerrer residence before and after the offense for which he was charged. Czemerynski was charged with the offense of criminal extortion allegedly committed between April 1 and July 31, 1984. Relying on CRE 404(b), the trial court allowed testimony concerning other calls to the Camerrer residence including an April 10, 1985 call in which the caller identified himself as Chuck Czemerynski because it proved identity and was part of the *res gestae* of the criminal episode. Czemerynski argues that the trial court erred in admitting the testimony. He claims that the additional uncharged calls were not "inseparably connected" nor part of the *res gestae* of the offense and accordingly the testimony was not admissible under CRE 404 or any other exception.

■ Evidence of other offenses is admissible under certain circumstances. For example, such evidence may be an integral part of the criminal transaction with which the defendant is charged. It also may be needed for the fact finder to understand the context in which the alleged crime occurred. *People v. Manier,* 184 Colo. 44, 54, 518 P.2d 811, 817 (1974). "Criminal occurrences do not always take place on a sterile stage; and where, as here, the events leading up to the crime are a part of the scenario which explain the setting in which it occurred, no error is committed by permitting the jury to view the criminal episode in the context in which it happened." *People v. Lobato,* 187 Colo. 285, 289–90, 530 P.2d 493, 496 (1975).

■ Evidence of other criminal conduct that occurs "contemporaneously with or is part and parcel of the crime charged is considered part of the *res gestae* of that offense, and consequently is not subject either to the general rule that excludes evidence of *prior* criminality or to the procedural requirements of *Stull.*" *Callis v. People,* 692 P.2d 1045, 1051 n. 9 (Colo.1984) (emphasis in original). Such *res gestae* evidence is admissible so long as it is relevant and its probative value is not substantially outweighed by the probability of unfair prejudice to the accused, *People v. Jackson,* 627 P.2d 741. *People v. Manier,* 184 Colo. at 52, 518 P.2d at 816.

■ As we discussed in part A above, it is within the trial court's discretion to admit cumulative evidence and to determine whether the prejudicial effect of proffered evidence outweighs its probative value. Absent an abuse of discretion, the trial court's decision will not be disturbed on review. *People v. Corbett,* 199 Colo. 490, 493, 611 P.2d 965, 967 (1980). *See also People v. Bynum,* 192 Colo. 60, 556 P.2d 469. The trial court's evidentiary decision was not an abuse of discretion, and we find that the trial court did not err in allowing testimony concerning non-charged telephone calls.

### V.

At trial, the People offered an audio tape which purported to be a collect call to Detective McLelland from Czemerynski. Czemerynski was in prison at the time and allegedly was returning a call made earlier by Detective McLelland. The portion of the tape which was played to the jury consisted of the caller stating his name as Chuck Czemerynski and a few one word responses. The detective then gave his opinion that the tape was a recording of Czemerynski's voice.

■ Czemerynski first claims that the tape's admission violated the People's stipulation that it had no statements by the defendant which it intended to use. The trial court concluded that the tape was not

a "statement" within the meaning of the defendant's motion to suppress statements. The trial court ruled that the tape recording was not introduced for the substantive content of any statements made by the defendant, but rather as an example of what the defendant's voice sounded like over the telephone.

Czemerynski further claims that it was error to allow Detective McLelland to testify that he had heard the defendant's voice when the defendant gave him some handwriting samples and that in his opinion it was the same voice as the one on the tape. Outside the presence of the jury, defense counsel claimed that he had consented to the handwriting samples being taken upon the condition that there would be no dialogue between Detective McLelland and Czemerynski. Therefore, according to the defense, it was government misconduct for the detective to have heard the defendant speak while obtaining handwriting samples. In the alternative, the defense argues that the conversation was brief and insufficient to allow the detective to form an opinion. In support of his arguments, the defendant cites only CRE 901(b)(5) which permits identification of a voice "by opinion, based upon hearing the voice at any time under circumstances connecting it with the alleged speaker."

The trial court heard argument on the defense's objection to the tape and Detective McLelland's opinion and found no violation of defendant's rights. The court reasoned that mere casual conversation occurred when the handwriting exemplar was taken and that it would not be credible to expect that the handwriting sample be taken "in pantomime." Also, the court found that a proper foundation had been laid as to the taped telephone conversation and as to Detective McLelland's opinion.

Again, we find no abuse of discretion on the part of the trial court. The tape was clearly relevant and properly admitted as a voice exemplar, and the trial court correctly determined that the tape recording was not included in the prosecution's stipula-

tion. Likewise, the detective's observation of the defendant's voice when he gave the handwriting sample was not improper. *Cf. People v. Matson,* 785 P.2d 141, 146 (Colo. 1990) (defendant's statements to polygraph technician admissible).

## VI.

Finally Czemerynski argues that the felony criminal extortion statute, section 18–3–207, 8B C.R.S. (1986), violates the equal protection guarantees of the Colorado Constitution, Article II, Section 25, because the same conduct is punished by the misdemeanor harassment statute, section 18–9–111, 8B C.R.S. (1986). He also claims that section 18–3–207 is unconstitutionally vague.

First, as to Czemerynski's equal protection claim, we find that the elements of criminal extortion are distinct from the elements of harassment and that there is a rational basis for classifying criminal extortion as a felony and classifying harassment as a misdemeanor. The pertinent portion of each statute is as follows:

> **18–3–207. Criminal extortion.** (1) Whoever without legal authority threatens to confine, restrain, or cause economic or bodily injury to the threatened person or another or to damage the property, economic well-being, or reputation of the threatened person or another with intent thereby to induce the threatened person or another against his will to do an act or refrain from doing a lawful act commits criminal extortion which is a class 4 felony.

> **18–9–111. Harassment.** (1) A person commits harassment if, with intent to harass, annoy, or alarm another person, he: ... (e) Initiates communication with a person, anonymously or otherwise by telephone, in a manner intended to harass or threaten bodily injury or property damage, or makes any comment, request, suggestion, or proposal by telephone which is obscene.

A statute is presumed to be constitutional and a party challenging the

statute must prove its unconstitutionality beyond a reasonable doubt. *Parrish v. Lamm,* 758 P.2d 1356, 1364 (Colo.1988). The right to equal protection of laws guarantees that all parties who are similarly situated receive like treatment by the law. *People v. Mozee,* 723 P.2d 117, 126 (Colo. 1986); *J.T. v. O'Rourke,* 651 P.2d 407, 413 (Colo.1982); *People v. Childs,* 199 Colo. 436, 610 P.2d 101 (1980). In the absence of a fundamental right or suspect classification, neither of which is applicable here, the appropriate standard of constitutional review for an equal protection claim is "whether the statutory classification has some rational basis in fact and is reasonably related to a legitimate government interest." *Smith v. Charnes,* 649 P.2d 1089, 1091 (Colo.1982); *see also Parrish v. Lamm,* 758 P.2d at 1370. Equal protection under the Colorado Constitution prohibits the punishment of identical criminal conduct with different criminal sanctions. *People v. Velasquez,* 666 P.2d 567, 569 (Colo.1983); *People v. Marcy,* 628 P.2d 69 (Colo.1981). However, if the elements of the crime are different, the mere fact that the defendant's "conduct may violate more than one statutory provision does not render such legislation constitutionally infirm." *People v. Rickstrew,* 775 P.2d 570, 574 (Colo.1989); *accord People v. Cagle,* 751 P.2d 614, 618–19 (Colo.1988).

In *People v. Hulse,* 192 Colo. 302, 557 P.2d 1205 (1976), we addressed the claim that it was unconstitutional for a defendant to be charged both with vehicular homicide, a felony, and with criminally negligent homicide, a misdemeanor. In upholding the constitutionality of both statutes, we held that

> [I]t is only where the *same* criminal conduct is proscribed in both statutes that the equal protection principle arises. In the statutes we compare today, there is a crucial difference in that the vehicular homicide statute requires for conviction that the prosecution prove the additional element of a death caused *through the use of a motor vehicle.*

192 Colo. at 304, 557 P.2d at 1206 (emphasis in original). *See People v. Rickstrew,*

775 P.2d at 575 ("When construing the statutes [sections 42–4–1401 and –1406, 17 C.R.S. (1984)] as a whole, it is readily apparent that the two statutes are not 'indistinguishable' even though both statutes may in part 'match virtually word for word.' "). *See also People v. Tippett,* 733 P.2d 1183 (Colo.1987) (no denial of equal protection to convict defendant both of violation of custody statute and kidnapping statute); *Velasquez,* 666 P.2d 567 (Colo. 1983) (there is a sufficient difference between the possession of marijuana and the possession of a marijuana concentrate, such as hashish, to justify the resulting differential in classification and penalty adopted by the legislature); *People v. Dunoyair,* 660 P.2d 890 (Colo.1983) (addressing differences between criminal mischief statute and crime of theft).

 A comparison of the criminal extortion statute and the harassment statute shows that each offense contains elements that are not present in the other. Criminal extortion requires the intent to induce the victim to do an act or refrain from doing a lawful act, whereas the criminal harassment statute, section 18–9–111(1)(e), specifically requires the use of a telephone when making harassing, threatening or obscene comments. In our view the extortion statute and the harassment statute address separate and distinct crimes. The statutes have a rational basis in fact and are reasonably related to legitimate government interests.

Secondly, we address Czemerynski's argument that the criminal extortion statute is unconstitutionally vague. He claims that the statute fails to give adequate notice of the prohibited conduct and that his alleged threats do not fall within the ambit of the criminal extortion statute.

 "The void for vagueness doctrine protects against the lack of fair warning to potential offenders and the lack of adequate standards for enforcement of the law." *Lee v. Smith,* 772 P.2d 82, 85 (Colo. 1989); *Grayned v. City of Rockford,* 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2298–99, 33

L.Ed.2d 222 (1972). Statutory terms need not be overly precise, however, because "the statutory language must strike a balance between two potential conflicting concerns: it must be specific enough to give fair warning of the prohibited conduct, yet must be sufficiently general to address the problem under varied circumstances and during changing times." *Parrish v. Lamm,* 758 P.2d at 1368; *see also People v. Allen,* 657 P.2d 447 (Colo.1983); *People v. Schoondermark,* 699 P.2d 411 (Colo. 1985). In order to succeed in a vagueness challenge, the complaining party must show that the statute is impermissibly vague in all of its applications. *Lee v. Smith,* 772 P.2d at 82; *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

This court also has recognized that statutes which require an intent to do a prohibited act are less likely to be invalidated because of vagueness or indefiniteness.

> The constitutional vice in [a vague or indefinite] statute is the essential injustice to the accused of placing him on trial for an offense, the nature of which the statute does not define and hence of which it gives no warning.... But where the punishment imposed is only for an act knowingly done with the purpose of doing that which the statute prohibits, the accused cannot be said to suffer from lack of warning or knowledge that the act which he does is a violation of law.

*People v. McBurney,* 750 P.2d 916, 920 (Colo.1988) (quoting *Screws v. United States,* 325 U.S. 91, 101–02, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945)). *See also Lee v. Smith,* 772 P.2d at 87 (section of Drug Paraphernalia Act which required culpable mental state of "knowingly" with respect to use of paraphernalia was not void for vagueness).

■ We hold that section 18–3–207 defines the offense of criminal extortion with adequate specificity. A person of reasonable intelligence could conclude that the statute prohibits one from threatening a teenage girl that he would "get her" and sexually assault her unless she would "talk dirty" to him or do specific sexually provocative acts, such as disrobing, while talking with him. The statute is worded in such a way as to give fair notice that one would be legally precluded from making such threats. Moreover, the criminal extortion statute requires that the state prove, as an element of the offense, that the defendant *intended* to induce the threatened person to do an act against against his will. *See McBurney,* 750 P.2d 916 (harassment statute not unconstitutionally vague); *People v. Norman,* 703 P.2d 1261 (Colo.1985) (statute addressing attempt to influence a public servant not unconstitutionally vague). We conclude that the extortion statute is not unconstitutionally vague and its application to the defendant did not deprive Czemerynski of due process of law.

Accordingly, we affirm the judgment of the district court.