22CA0344 Peo v Clark 11-21-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA0344
La Plata County District Court No. 20CR147
Honorable Todd P. Norvell, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Christopher Joe Clark,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE FOX
Johnson and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 21, 2024

Philip J. Weiser, Attorney General, Brock J. Swanson, Senior Assistant
Attorney General, Denver, Colorado, for Plaintiff-Appellee

Patrick R. Henson, Alternate Defense Counsel, Denver, Colorado, for
Defendant-Appellant

¶ 1     Defendant, Christopher Joe Clark, appeals his conviction and sentence entered on a jury verdict finding him guilty of tampering with a witness or victim.  We affirm.

## I.     Background

¶ 2     Based on Clark's alleged victimization of J.Q., he was charged with sexual assault, second degree assault, third degree assault, felony menacing, tampering with a witness or victim, obstruction of telephone service, obstruction of a peace officer, violation of bail bond conditions, three counts of violation of a protection order, and eight habitual counts.

¶ 3     On the second day of trial, Clark pleaded guilty to obstruction of a peace officer.  After the prosecution rested, Clark moved for judgment of acquittal on all remaining counts.  The trial court granted the motion on the obstruction of telephone service charge but denied it as to all other counts.

¶ 4     A jury acquitted Clark on the sexual assault, second degree assault, third degree assault, and felony menacing counts.  However, the jury convicted Clark on the violation of bail bond conditions count, the tampering with a witness or victim count, and

three counts of violation of a protection order.[1]  The jury also found that the violation of a protection order and tampering counts included acts of domestic violence.

¶ 5    After the trial, Clark filed a written motion for judgment of acquittal on the tampering count, which the trial court denied.

¶ 6    Before sentencing, Clark filed a motion for a proportionality review.  After the prosecution responded, the trial court conducted an abbreviated proportionality review and denied the motion.

¶ 7    Clark was adjudicated a habitual criminal based on four prior felonies: first degree criminal trespass, vehicular alluding, attempted sexual assault on a child, and failure to register as a sex offender.  The trial court sentenced him in accordance with the habitual criminal statute to twenty-four years in the custody of the Department of Corrections (DOC) on the tampering count, along with concurrent jail sentences on the remaining counts.

## II.    Sufficiency of the Evidence

¶ 8    Clark first contends that the trial court erred by denying his motions for judgment of acquittal on the tampering with a witness

---

[1] Clark only appeals the tampering with a witness or victim conviction and his sentence.

or victim count.  Specifically, he claims that there was insufficient evidence to prove that he intentionally attempted to induce a witness or victim to testify falsely or unlawfully withhold testimony.

### A.    Standard of Review and Applicable Law

¶ 9    In assessing the sufficiency of the evidence, we review the record de novo to determine whether the evidence was "sufficient in both quantity and quality" to sustain a conviction.  *McCoy v. People*, 2019 CO 44, ¶ 63.  In doing so, we view the evidence as a whole and in the light most favorable to the prosecution to determine if the evidence is "substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt."  *McDonald v. People*, 2021 CO 64, ¶ 64 (citation omitted).  In applying this test, we give the prosecution the benefit of every reasonable inference that can be drawn from the evidence.  *Id.*  That "the evidence was disputed . . . and that reasonable alternative inferences were possible" does not render the evidence insufficient.  *People v. Donald*, 2020 CO 24, ¶ 41.

¶ 10    As relevant here,

> [a] person commits tampering with a witness or victim if he intentionally attempts without bribery or threats to induce a witness or victim

3

or a person he believes is to be called to testify as a witness or victim in any official proceeding or who may be called to testify as a witness to or victim of any crime to . . . [t]estify falsely or unlawfully withhold any testimony.

§ 18-8-707(1)(a), C.R.S. 2024.

## B. Additional Facts

¶ 11    The tampering with a witness or victim charge stemmed from a letter that Clark sent to the victim, J.Q. (also known as M.), while the charges in this case were pending and a protection order was in place. The prosecution submitted the letter at trial, which was admitted into evidence without objection and read aloud to the jury.

¶ 12    In the letter, Clark flattered and complimented J.Q.; apologized for past behavior; proclaimed his love for her; indicated that he is protective of her; said that he was trying to get them into stable housing; expressed his desire for a romantic relationship with her; promised safety; and asked her for help communicating. He also stated the following:

> I know I'm real aggressive and intimidating, especially with a shaved head. It makes me look mean. But, no matter what problems you and I have, you are safe to talk to me. We can talk through our problems respectfully.

4

I want us to establish a safe word. It's 'baby blue,' for calm/cool. When I'm making you feel scared or unsafe, I want you to say "baby blue." I'll take a breath, take a seat and give you a little space so you feel safe.

. . . .

"[M.], I assure you I didn't do what I'm being accused of. I've been beating my head against the wall to try to figure out why [J.Q.] went to such extremes. I just tried to provide her with a place to stay. But she and I got into an argument and I did a good job at scaring her. The argument was heated and you know how intimidating I can be. I honestly don't realize that. I don't mean to be.

[J.Q.] is tiny — petite, and I'm much bigger than she is. She's about 5' 4"-5' 5". But she has also been beat up and raped by guys on the streets. I found out by my investigator that her ex "Brett" has done a lot of abusive things to her. I don't know what all is true but it seems that some of the allegations she's made against me actually did happen at some point by Brett.

. . . .

I don't know why [J.Q.] would falsely accuse me to such degree. She knows what really happened. I just hope she comes forward with the truth. My attorney told me that if [J.] were to come to my hearing in May and tell the truth, the judge would drop all my charges.

. . . .

5

I told my attorney that [J.Q.] is probably going to either not show up or she's going to show up and tell the truth. She's scared of me. She has no reason to be. I'm not a threat.

Especially [J.Q.], she is vulnerable. I just don't know what to do. I can't accept that she made it all up out of hate or spite. She knows what happened. There's a video from Urgent Care that shows me snatch a lotto ticket out of her hand and rip it up. She starts hitting me in the back of the head and manages to push me down. I got up and smacked her in the lower back with an open hand as she started to run away. But everything else is not true. Just because she's a girl doesn't mean I can't defend myself.

She must hate me. The only way I'll turn my back on her is if she continues to lie and tries to help DA on the false charges. If she's honest, I'll own up to what I did do in open court right then and there.

¶ 13    The extent of J.Q.'s testimony regarding the letter was that she did not read the letter but experienced "terror" when she received it.

¶ 14    In closing argument, the prosecutor pointed out the statements in which Clark told J.Q. to tell the "truth" as support for Clark urging J.Q. to testify falsely:

He's telling her to tell the truth but, at the same time, that truth that he's telling her is not true. He's making up video. He's telling her things. He's apologizing. So when he says "Come to court and tell the truth," he's really

6

doing the exact opposite. He's telling her to testify falsely.

And as support for Clark inducing J.Q. to unlawfully withhold testimony, the prosecutor directed the jury's attention to Clark's statement, "I told my attorney that [J.Q.] is probably going to either not show up or she's going to show up and tell the truth."

## C. Analysis

¶ 15 Clark first argues that the statements in the letter were insufficient to prove that he induced J.Q. to testify falsely because Clark was actually asking J.Q. to tell the truth. Therefore, Clark asserts, in order to convict him based on his requests for J.Q. to tell the truth, the jury had to speculate and guess that he was in fact asking J.Q. to lie. *See People v. Sprouse*, 983 P.2d 771, 778 (Colo. 1999) ("[V]erdicts in criminal cases may not be based on guessing, speculation, or conjecture."). He further asserts that, in order to construe Clark's statements as asking J.Q. to testify falsely, the jury had to speculate that Clark's "truth" was false and J.Q.'s "truth" was correct.

¶ 16 However, we see what Clark calls inappropriate speculations as reasonable inferences that the jury could have made based on

the contents of the letter. A large portion of the letter is dedicated to professing Clark's love for J.Q., which the jury could have reasonably inferred as Clark's attempt to manipulate J.Q. into complying with his request to testify falsely. The jury also could have inferred that the "truth" Clark was asking J.Q. to testify about was a recantation of her story and a proclamation that Clark did not do any of the things he was alleged to have done. Moreover, the jury could have inferred that the "truth" Clark was asking J.Q. to tell was the story that "Brett" committed the offenses rather than Clark. What the "truth" was that Clark asked J.Q. to put forward was for the jury to decide, and we "may not serve as a thirteenth juror and consider whether [we] might have reached a different conclusion than the jury." *People v. Harrison*, 2020 CO 57, ¶ 33.

¶ 17    Second, Clark argues that the evidence was insufficient to prove that he induced J.Q. to unlawfully withhold testimony because by saying, "I told my attorney that [J.Q.] is probably going to either not show up or she's going to show up and tell the truth," Clark was merely predicting that J.Q. would not show up for court. While it is true that J.Q. failed to appear for several pretrial

hearings even when subpoenaed to do so, a jury still could have inferred that Clark was asking J.Q. not to appear at trial to testify.

¶ 18    *People v. Nozolino*, 2014 COA 95, on which Clark relies, is distinguishable. In that case, after learning that the police were interviewing Nozolino's family members regarding alleged crimes he had committed, Nozolino emailed his mother and brother recommending that they not cooperate with the police. *Id.* at ¶¶ 4, 11. Nozolino was indicted and later convicted on multiple counts of witness tampering. *Id.* at ¶ 5. On appeal, Nozolino argued that there was insufficient evidence to support the witness tampering convictions related to his mother and brother. *Id.* at ¶ 7. The division agreed with Nozolino, concluding that the emails did not advise or advocate unlawful withholding of testimony. *Id.* at ¶ 12. Rather, the division reasoned, "an individual may lawfully refuse to speak with the police, and it is not unlawful for a citizen to withhold cooperation during a consensual encounter with law enforcement." *Id.* Contrary to *Nozolino*, here Clark's statements in the letter urged J.Q. not to testify at court proceedings; they did not recommend that she not cooperate with the police.

¶ 19    For these reasons, we conclude that reasonable inferences from Clark's letter to J.Q. supported the requirement that Clark attempted to induce J.Q. to testify falsely and unlawfully withhold testimony.  Accordingly, there was sufficient evidence to support Clark's tampering with a witness or victim conviction.  *See People v. Cunefare*, 102 P.3d 302, 307 (Colo. 2004).

## III.    Constructive Amendment

¶ 20    Clark also contends for the first time on appeal that the prosecution's opening and closing arguments constructively amended the tampering with a witness or victim charge.  He asserts that the prosecution created the false implication that the statements in the letter constituted a threat to J.Q., but threatening a witness is an element of retaliation against a witness or victim and is not a means by which a person can commit tampering with a witness or victim.  We discern no error.

### A.    Preservation, Applicable Law, and Standard of Review

¶ 21    Clark did not preserve this issue for appeal.  We therefore review for plain error.  *Hagos v. People*, 2012 CO 63, ¶ 14; *Bock v. People*, 2024 CO 61, ¶¶ 14-23 (constructive amendments do not constitute structural error, and unpreserved arguments regarding

them are reviewed for plain error).  Plain error is obvious and substantial, and we reverse only if the error so undermined the fundamental fairness of the trial so as to cast serious doubt on the reliability of the judgment of conviction.  *Hagos*, ¶ 14.

¶ 22    A charging document "must be definite enough to give a defendant sufficient notice of the crime alleged to prepare a defense, and must recite the essential facts of the crime to protect him from further prosecution for the same offense."  *People v. Pahl*, 169 P.3d 169, 177 (Colo. App. 2006).  One type of variance between the charge contained in the charging document and the charge for which a defendant is convicted is a constructive amendment.  "A constructive amendment occurs when a jury instruction 'changes an essential element of the charged offense and thereby alters the substance of the charging instrument.'"  *Bock*, ¶ 14 (quoting *People v. Rediger*, 2018 CO 32, ¶ 48).

¶ 23    We review de novo whether an impermissible variance occurred, as it is a question of law.  *People v. Counterman*, 2021 COA 97, ¶ 96, *vacated and remanded on other grounds sub nom.*, *Counterman v. Colorado*, 600 U.S. 66 (2023).

## B. Analysis

¶ 24 For the tampering with a witness or victim count, the information alleged that Clark "unlawfully, feloniously, and intentionally attempted, without bribery or threats, to induce [J.Q.], a witness, a victim, or a person the defendant believed might be called to testify as a witness or victim of any crime to testify falsely or unlawfully withhold any testimony, in violation of section 18-8-707, C.R.S."

¶ 25 In conformity with the pattern jury instructions as they applied to the tampering statute, the jury was instructed on the elements of tampering with a witness or victim. *See* COLJI-Crim. 8-7:10 (2021).

¶ 26 Clark does not argue that the jury instruction changed an essential element of the charged offense, thereby altering the substance of the charging document. Rather, he asserts that the prosecutor made comments during opening statement and closing argument that amended the tampering charge. This is not a valid claim for a constructive amendment. Nor does Clark submit any authority for the proposition that a prosecutor's statements can constructively amend a charge.

12

¶ 27　Even so, the pattern jury instruction did not alter an element of the charged offense of tampering with a witness or victim. Accordingly, we conclude that no constructive amendment occurred.

¶ 28　For the first time in the reply brief, Clark also argues that a simple variance occurred. *See People v. Smith*, 2018 CO 33, ¶ 25 (A simple variance occurs "when the evidence presented at trial proves facts materially different from those alleged in the charging document."). However, we will not address arguments made for the first time in a reply brief. *See People v. Czemerynski*, 786 P.2d 1100, 1107 (Colo. 1990), *abrogated on other grounds by Rojas v. People*, 2022 CO 8.

## IV.　Proportionality Review

¶ 29　Finally, Clark contends that his twenty-four-year sentence for tampering with a witness or victim raises an inference of gross disproportionality necessitating an extended proportionality review. We disagree.

### A.　Standard of Review and Applicable Law

¶ 30　We review the proportionality of a sentence de novo. *Wells-Yates v. People*, 2019 CO 90M, ¶ 35.

¶ 31    The Eighth Amendment prohibits sentences that are grossly disproportionate to the crime committed. *See id.* at ¶ 5. In analyzing that, courts engage in an objective, two-step approach for reviewing whether a sentence is grossly disproportionate. *See id.* at ¶ 7. Courts first conduct an abbreviated proportionality review and then, if necessary, an extended proportionality review. *Id.* at ¶ 15.

¶ 32    In conducting an abbreviated proportionality review of a habitual criminal sentence, we must (1) assess "the gravity or seriousness of all the offenses in question — the triggering offense and the predicate offenses," and (2) consider "the harshness of the sentence imposed on the triggering offense." *Id.* at ¶ 23. We determine whether the triggering offense and the predicate offenses, in combination, "are so lacking in gravity or seriousness so as to suggest that the sentence is unconstitutionally disproportionate to the crime, taking into account the defendant's eligibility for parole." *Id.* If the abbreviated proportionality review reveals no inference of gross disproportionality, no further analysis is required. *See id.* at ¶ 15.

¶ 33    Only when a sentence yields an inference of gross disproportionality does a court conduct an extended proportionality

14

review, comparing the defendant's sentence to (1) sentences for other crimes in the same jurisdiction and (2) sentences for the same crime in other jurisdictions. *Id.* at ¶¶ 15-17.

### B. Analysis

#### 1. Gravity or Seriousness

¶ 34 The gravity or seriousness of an offense requires considering the harm caused or threatened to the victim or society and the culpability of the offender. *Id.* at ¶ 12. Relevant factors in determining the harm to the victim or society include the magnitude of the offense; whether the offense involved violence; "whether the crime is a lesser-included offense or the greater-inclusive offense; whether the crime involves a completed act or an attempt to commit an act; and whether the defendant was a principal or an accessory after the fact in the criminal episode." *Id.*; *People v. Mershon*, 874 P.2d 1025, 1032 (Colo. 1994), *abrogated on other grounds by Melton v. People*, 2019 CO 89. In terms of the defendant's culpability, courts should consider motive and "whether the defendant's acts were negligent, reckless, knowing, intentional, or malicious." *Wells-Yates*, ¶ 12.

### a. Triggering Offense

¶ 35 Viewing the evidence in the light most favorable to the prosecution, as we must, shows that the letter Clark wrote to J.Q., the receipt of which caused her to feel "terror," was an intentional attempt to induce her to testify falsely or to withhold testimony. Moreover, the jury found that the tampering count involved an act of domestic violence. And in the course of committing the witness tampering offense, Clark was simultaneously violating protection orders that prohibited him from contacting J.Q. Finally, Clark's likely motive in committing witness tampering was to undermine the objectives of the criminal justice system. With these factors in mind, we conclude that the witness tampering offense in this case was grave or serious.

### b. Predicate Offenses

¶ 36 We agree with Clark that his predicate offense of first degree criminal trespass was not grave or serious and we will assume without deciding that, in this instance, his failure to register as a sex offender is also not grave or serious. But we disagree with his position that the remaining two predicate offenses were not grave or serious.

16

¶ 37     "First degree criminal trespass may not be a per se grave or serious offense." *People v. Green*, 2012 COA 68M, ¶ 57.  The underlying facts of Clark's first degree criminal trespass offense indicate that within a ten-day period, he unlawfully entered four vehicles and stole items from the glove compartments.  Considering the minor magnitude of these circumstances, we conclude that Clark's first degree criminal trespass offense was not grave or serious.

¶ 38     A division of this court previously held that vehicular eluding poses a grave risk of harm to the public, and a conviction for such conduct is a grave or serious offense.  *See People v. Allen*, 111 P.3d 518, 520 (Colo. App. 2004).  However, in *Wells-Yates*, the supreme court more recently "conclude[d] that the designation of per se grave or serious for purposes of a proportionality review must be reserved for those rare crimes which, based on their statutory elements, necessarily involve grave or serious conduct." *Wells-Yates*, ¶ 63.  Regardless, the circumstances of Clark's offense lead us to conclude that his offense was indeed grave or serious.  While intoxicated, Clark kidnapped his girlfriend, drove with her in a car at a high rate

of speed, threatened to kill her, prevented her from leaving the vehicle, and fled from law enforcement in the car and on foot.

¶ 39 As to Clark's conviction for attempted sexual assault on a child, we conclude that the offense was grave or serious. The circumstances underlying the offense were that a seven-year-old child-victim disclosed that Clark had touched her genitalia. The severity of this offense is significant in at least four ways: (1) Clark was charged with sexual assault on a child and pleaded guilty to attempt; (2) the assault took place in the child's residence; (3) Clark engaged in grooming of the victim, such as giving the child gifts for her silence; and (4) Clark was a registered sex offender at the time. This offense involves a situation where Clark attempted to use a vulnerable child as a tool for sexual fulfillment, potentially resulting in lifetime harm to the child. The harm to the victim and to society from such behavior was indeed grave or serious.

¶ 40 As to Clark's failure to register conviction, the underlying facts are that Clark failed to register as a sex offender within five days of being released from jail and during the following month, before he was re-arrested on a separate charge. A division of this court previously concluded that "a defendant's failure to register as a sex

18

offender is grave or serious because it threatens harm to society by hindering the state's ability to treat and supervise the sex offender." *Green*, ¶ 51. But whether failure to register as a sex offender is per se grave or serious has yet to be determined under the supreme court's new framework, as laid out in *Wells-Yates*. *See Wells-Yates*, ¶ 63. We will assume without deciding that this offense is not per se grave or serious.

¶ 41 In sum, Clark's triggering offense and two of his predicate offenses were grave or serious.

2. The Offenses in Combination and the Harshness of the Penalty

¶ 42 "It is not necessary for each offense to be grave or serious for a court to conclude that a sentence is not grossly disproportionate." *People v. Loris*, 2018 COA 101, ¶ 29. Instead, when looking at the triggering and predicate offenses in combination, the supreme court has directed courts to consider the nonexclusive list of factors outlined in part IV.A. In doing so, we see that, in all of his offenses — whether grave or serious or not — Clark was the principal actor. And all of his offenses, except for the attempted sexual assault on a child — grave or serious in its own right — were completed acts. Furthermore, most of the offenses included significant culpable

19

conduct. For example, the witness tampering offense required proof that Clark intentionally undertook the actions. *See* § 18-8-707(1)(a). And the vehicular eluding offense required proof of knowing conduct. *See* § 18-9-116.5, C.R.S. 2024.

¶ 43 With that in mind, we turn to a comparison of the gravity or seriousness of the triggering and predicate offenses in combination with the harshness of the penalty for Clark's witness tampering offense. *See Wells-Yates,* ¶ 23.

¶ 44 When considering the harshness of the penalty, "a great deal of deference is due to legislative determinations regarding sentencing." *People v. Deroulet,* 48 P.3d 520, 523 (Colo. 2002), *abrogated on other grounds by Wells Yates.* "[I]n non-capital cases, courts will rarely conclude that a defendant's sentence is grossly disproportionate." *Rutter v. People,* 2015 CO 71, ¶ 16. Consequently, "in almost every case, the abbreviated proportionality review will result in a finding that the sentence is constitutionally proportionate, thereby preserving the primacy of the General Assembly in crafting sentencing schemes." *Deroulet,* 48 P.3d 520 at 526.

¶ 45     On the tampering conviction, Clark was sentenced to twenty-four years in the custody of the DOC and will be eligible for parole after twelve years of confinement. *See* § 17-22.5-403(1), C.R.S. 2024. "[W]hether a sentence is parole eligible is relevant during an abbreviated proportionality review because parole can reduce the actual period of confinement and render the penalty less harsh." *Wells-Yates*, ¶ 14.

¶ 46     Based on the gravity and seriousness of Clark's offenses in combination — which indicate a persistent disregard for the law — compared to his parole-eligible, twenty-four-year sentence, we conclude that Clark has not raised an inference of gross disproportionality. *See id.* at ¶ 8; *see also People v. Gee*, 2015 COA 151, ¶ 65 (concluding that the defendant's forty-eight-year prison sentences were not grossly disproportionate where each was supported by "at least two convictions for grave or serious crimes . . . and a third felony conviction"); *Loris*, ¶ 30 (considering a defendant's persistent disrespect for the rule of law in making a proportionality determination).

¶ 47     For these reasons, we conclude that the trial court did not err by determining that his sentence for tampering with a witness or

victim did not raise an inference of gross disproportionality. It follows that Clark is not entitled to an extended proportionality review of his sentence. *See Wells-Yates*, ¶ 15.

## V. Disposition

¶ 48 The judgment of conviction and sentence are affirmed.

JUDGE JOHNSON and JUDGE SCHOCK concur.