Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's
homepage at http://www.courts.state.co.us.  Opinions are also
posted on the Colorado Bar Association's homepage at
http://www.cobar.org.

ADVANCE SHEET HEADNOTE
November 4, 2019

## 2019 CO 90

**No. 16SC592, *Wells-Yates v. People*—Proportionality Review—Per Se Grave or Serious Crimes—Habitual Criminal Punishment.**

In this case and two companion cases, the supreme court considers multiple issues that lie at the intersection of proportionality review and habitual criminal punishment.  In the process, the court endeavors to shed light on these areas of the law and to correct a few misstatements that appear in the caselaw.

The court holds that: (1) during an abbreviated proportionality review of a habitual criminal sentence, the court must consider each triggering offense and the predicate offenses together and determine whether, in combination, they are so lacking in gravity or seriousness as to raise an inference that the sentence imposed on that triggering offense is grossly disproportionate; (2) in determining the gravity or seriousness of the triggering offense and the predicate offenses, the court should consider any relevant legislative amendments enacted after the dates of those offenses, even if the amendments do not apply retroactively; (3) not all

narcotic offenses are per se grave or serious; and (4) the narcotic offenses of possession and possession with intent are not per se grave or serious. Because the court of appeals' decision is at odds with this opinion, its judgment is reversed. Accordingly, the case is remanded with instructions to return it to the trial court for further proceedings consistent with this opinion.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2019 CO 90

### Supreme Court Case No. 16SC592
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 13CA1216

### Petitioner:

Belinda May Wells-Yates,

v.

### Respondent:

The People of the State of Colorado.

### Judgment Reversed
*en banc*
November 4, 2019

**Attorneys for Petitioner:**
Megan A. Ring, Public Defender
Dayna Vise, Deputy Public Defender
*Denver, Colorado*

**Attorneys for Respondent:**
Philip J. Weiser, Attorney General
Michael D. McMaster, Senior Assistant Attorney General
*Denver, Colorado*

**JUSTICE SAMOUR** delivered the Opinion of the Court.
**JUSTICE BOATRIGHT** concurs in the judgment.
**CHIEF JUSTICE COATS** dissents.

¶1     Our General Assembly long ago adopted the Habitual Criminal Act for the purpose of punishing more severely "those individuals who show a propensity toward repeated criminal conduct." *People v. Dist. Ct.*, 711 P.2d 666, 670 (Colo. 1985).  But the legislature's authority to prescribe harsher punishment for habitual criminals is not without constitutional contours.  It is limited by the principle of proportionality that is embedded in the constitutional prohibition against the infliction of cruel and unusual punishment.  Very generally, proportionality is a foundational "precept of justice that punishment for [a] crime should be graduated and proportioned to [the] offense." *Weems v. United States*, 217 U.S. 349, 367 (1910).  Simply put, the concept of proportionality dictates that the punishment should fit the crime.

¶2     In this case and the two companion cases we announce today, *Melton v. People*, 2019 CO 89, ___ P.3d ___, and *People v. McRae*, 2019 CO 91, ___ P.3d ___, we consider multiple issues that lie at the intersection of proportionality review and habitual criminal punishment.  We hold that: (1) during an abbreviated proportionality review of a habitual criminal sentence, the court must consider each triggering offense and the predicate offenses together and determine whether, in combination, they are so lacking in gravity or seriousness as to raise an inference that the sentence imposed on that triggering offense is grossly

2

disproportionate;[1] (2) in determining the gravity or seriousness of the triggering offense and the predicate offenses, the court should consider any relevant legislative amendments enacted after the dates of those offenses, even if the amendments do not apply retroactively; (3) not all narcotic offenses are per se grave or serious; and (4) the narcotic offenses of possession and possession with intent are not per se grave or serious. Because the court of appeals' decision is at odds with the conclusions we reach today, we reverse its judgment.[2] Accordingly, we remand with instructions to return the case to the trial court for further proceedings consistent with this opinion.

¶3     In order to place this appeal in context, we begin with a primer on proportionality review and a synopsis of habitual criminal punishment (focusing on proportionality review of a habitual criminal sentence). In the process, we endeavor to shed light on these areas of the law and to correct a few misstatements that appear in our caselaw. After setting forth the pertinent legal principles, we discuss the factual and procedural history of this case and identify the controlling standard of review. We then proceed to analyze the issues before us.

---

[1] In this opinion, we refer to the felony convictions for which a defendant was sentenced as "triggering offenses," and to the prior felony convictions on which a defendant's habitual criminal adjudication was based as "predicate offenses."

[2] In fairness to our learned colleagues on the court of appeals, today we clarify the law related to the issues on review.

# I. Proportionality Review

¶4    The concept of proportionality is rooted in both the U.S. and Colorado Constitutions. Therefore, our discussion is informed by both federal and Colorado law. We examine each in turn.

## A. Federal Authority

¶5    The Eighth Amendment to the U.S. Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. In *Solem v. Helm*, 463 U.S. 277, 284 (1983), the Supreme Court construed the last clause in this amendment as prohibiting "not only barbaric punishments, but also sentences that are disproportionate to the crime committed." However, the Court has since narrowed the guarantee of proportionality: "The Eighth Amendment does not require strict proportionality between crime and sentence"; instead, "it forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Kennedy, J., concurring) (quoting *Solem*, 463 U.S. at 288).[3] It is "exceedingly rare" for a sentence to be deemed so extreme that it is grossly disproportionate to the crime. *Id.*

---

[3] *Harmelin* was a fractured decision; Colorado has adopted Justice Kennedy's concurring opinion because it resolved the case on the narrowest grounds and obtained the support of the largest number of justices. *Close v. People*, 48 P.3d 528, 535 (Colo. 2002) (noting that Justice Kennedy's concurring opinion is widely viewed as "the rule of *Harmelin*"). For the sake of convenience, we hereafter refer

4

¶6    *Harmelin* distilled the following four principles from the Supreme Court's proportionality jurisprudence:

- "[T]he fixing of prison terms . . . involves a substantive penological judgment" that belongs to the legislature and should be given substantial deference by reviewing courts.

- There are a number of legitimate penological schemes based on concerns related to "retribution, deterrence, incapacitation, and rehabilitation," and the Eighth Amendment does not require the adoption of any particular scheme.

- Significant differences in sentencing philosophies and in the length of prescribed prison terms are inevitable; even assuming consistency in philosophies, "differing attitudes and perceptions of local conditions" may lead to different, though rational, determinations related to sentencing.

- Proportionality review should be guided "by objective factors to the maximum possible extent"; the relative absence of objective factors to differentiate between sentences has meant that succeeding on a proportionality challenge is an infrequent occurrence.

*Id.* at 998–1001 (internal quotation marks omitted). These principles are what led *Harmelin* to cabin the holding in *Solem* as barring only extreme sentences that are grossly disproportionate. *See id.* at 1001.

¶7    But how does a court ascertain whether a sentence is grossly disproportionate and therefore unconstitutional under the Eighth Amendment? In *Solem*, the Court adopted an objective, two-step approach for undertaking a

---

to Justice Kennedy's concurrence by the title of the case, *Harmelin*, or as "the rule of *Harmelin*."

proportionality review.[4]  463 U.S. at 290–91.  Step one includes two subparts: The

trial court should consider (1) the gravity or seriousness of the offense and (2) the

harshness of the penalty.  *Id.*  In step two, the trial court may compare the

challenged sentence to sentences for other crimes in the same jurisdiction and

sentences for the same crime in other jurisdictions.  *Id.* at 291–92.  *Harmelin* clarified

that this is not a wooden test requiring consideration of step two in every case.

501 U.S. at 1004.  Instead, step two's comparative analysis within and between

jurisdictions is appropriate "only in the rare case in which a threshold comparison

of the crime committed and the sentence imposed leads to an inference of gross

disproportionality."  *Id.* at 1005.  Viewed through the prism of *Harmelin*, then, the

purpose of any comparative analysis of sentences in step two "is to validate an

initial judgment" in step one "that a sentence is grossly disproportionate to a

crime."  *Id.*

---

[4] *Harmelin* described the procedure *Solem* marshaled in as a "three-part test" because of the way the *Solem* Court discussed the relevant considerations: (1) the gravity or seriousness of the offense and the harshness of the penalty; (2) a comparison of the challenged sentence to sentences for other crimes in the same jurisdiction; and (3) a comparison of the challenged sentence to sentences for the same crime in other jurisdictions.  *See Harmelin*, 501 U.S. at 1004 (citing *Solem*, 463 U.S. at 290–91).  As we explain in this opinion, however, given the structure and sequence of the analysis, we think it is clearer to view it as a two-step process (with parts (2) and (3) collapsed into a single step, step two).

¶8    Thus, under *Solem*, as construed in *Harmelin*, when a defendant makes a timely request for a proportionality review, the court must compare the gravity or seriousness of the offense to the harshness of the penalty (step one). If that analysis gives rise to an inference of gross disproportionality, the court must proceed to step two and conduct intrajurisdictional and interjurisdictional comparisons. But if the analysis in step one does not give rise to an inference of gross disproportionality, the proportionality challenge fails and the sentence must be upheld.

¶9    A dozen years after *Harmelin*, the Supreme Court revisited the Eighth Amendment's narrow proportionality principle in *Ewing v. California*, 538 U.S. 11 (2003). Unfortunately, the Court remained fractured.[5] But the three-justice plurality opinion in *Ewing* did not alter the analytical framework ushered in by the rule of *Harmelin*. To the contrary, it expressly acknowledged that "[t]he proportionality principles . . . distilled in Justice Kennedy's concurrence [in *Harmelin*] guide[d] [its] application of the Eighth Amendment" to Ewing's recidivist sentence. *Id.* at 23–24. Thus, in rejecting Ewing's claim that his three-strikes sentence was unconstitutionally disproportionate to his offense of felony

---

[5] Justice O'Connor's plurality opinion in *Ewing*, which was joined by Chief Justice Rehnquist and Justice Kennedy, is understood as representing the narrowest basis for the Court's decision and is viewed as controlling. *See United States v. Farley*, 607 F.3d 1294, 1340 n.31 (11th Cir. 2010).

7

grand theft, the plurality followed *Harmelin* and "address[ed] the gravity of the offense compared to the harshness of the penalty." *Id.* at 28.

## B. Colorado Law

¶10 Article II, section 20 of the Colorado Constitution is identical to the Eighth Amendment. Colo. Const. art. II, § 20. As such, we have generally embraced the Supreme Court's approach to proportionality challenges. *See Close v. People*, 48 P.3d 528, 538 (Colo. 2002). However, our analysis does not mirror the Supreme Court's. We explore the differences next, starting with step one, which in Colorado legal parlance has become known as an "abbreviated proportionality review," followed by step two, which in Colorado legal parlance has become known as an "extended proportionality review."

## 1. Abbreviated Proportionality Review (Step One)

¶11 In line with Supreme Court precedent, at step one, Colorado courts consider the gravity or seriousness of the offense and the harshness of the penalty. But our precedent has carved out two additional principles with respect to this initial step. One of them pertains to the gravity or seriousness of the offense (the first subpart of step one), while the other relates to the harshness of the penalty (the second subpart of step one). We discuss each before moving on to step two.

8

## a. Gravity or Seriousness of the Offense

¶12 We acknowledged in *People v. Gaskins*, 825 P.2d 30, 36 (Colo. 1992), that the determination regarding the gravity or seriousness of the offense is "somewhat imprecise," notwithstanding the guidance provided in *Solem*. The Court in *Solem* explained that trial courts should consider "the harm caused or threatened to the victim or society," as well as "the culpability of the offender." 463 U.S. at 292. It then listed factors that are pertinent to the inquiry. In terms of the harm to the victim or society, it instructed courts to focus on: "[t]he absolute magnitude of the crime" (theft of a large amount will usually be more serious than theft of a small amount when all other circumstances are equal); whether the crime is a lesser-included offense or the greater-inclusive offense; whether the crime involves a completed act or an attempt to commit an act; and whether the defendant was a principal or an accessory after the fact in the criminal episode. *Id.* at 293. As it relates to the defendant's culpability, it observed that motive is relevant, as is whether the defendant's acts were negligent, reckless, knowing, intentional, or malicious. *Id.* at 293–94. Of course, the Court cautioned that these are not exhaustive lists; they merely illustrate "that there are generally accepted criteria for comparing the severity of different crimes on a broad scale, despite the difficulties courts face in attempting to draw distinctions between similar crimes." *Id.* at 294.

¶13 While we have generally adhered to *Solem*'s teachings in discerning whether a crime is grave or serious, we mentioned in *Close*, 48 P.3d at 538, and *People v. Deroulet*, 48 P.3d 520, 524 (Colo. 2002), that *Gaskins* allows a shortcut in some situations that bypasses *Solem*'s analysis. In both cases, we read *Gaskins* as establishing that the following crimes had already been declared inherently (or per se) grave or serious for proportionality purposes in Colorado: aggravated robbery, robbery, burglary, accessory to first degree murder, and narcotics-related crimes. *Deroulet*, 48 P.3d at 524; *see also Close*, 48 P.3d at 538 (adding three offenses to *Deroulet*'s list of inherently dangerous crimes: felony menacing, attempted burglary, and conspiracy to commit burglary).[6] For these crimes, we explained, a trial court may skip the first subpart of step one—the determination regarding the gravity or seriousness of the crimes—and "proceed directly to the second sub-part" of that step—the assessment related to the harshness of the penalty. *Close*, 48 P.3d at 538; *accord Deroulet*, 48 P.3d at 524.

---

[6] Our court has never used the term "per se grave or serious," but it is clear that we meant just that in *Close* and *Deroulet*. *Cf. Rutter v. People*, 2015 CO 71, ¶ 37, 363 P.3d 183, 191–92 (Gabriel, J., dissenting) (citing *Deroulet*, 48 P.3d at 524, and referring to certain "per se grave or serious" crimes). And that is how the divisions of the court of appeals have uniformly understood our jurisprudence. *See, e.g., People v. McCulloch*, 198 P.3d 1264, 1268 (Colo. App. 2008).

## b. Harshness of the Penalty

¶14    Our treatment of the harshness of the penalty (the second subpart of step one) is somewhat unique in that we explicitly consider parole eligibility.  *People v. Drake*, 785 P.2d 1257, 1275 (Colo. 1990), *abrogated on other grounds as recognized by People v. Chavez-Barragan*, 2016 CO 66, ¶¶ 33–34, 379 P.3d 330, 338; *see also People v. Hernandez*, 686 P.2d 1325, 1330 n.4 (Colo. 1984) (inferring that the decision in *Solem* must have been driven in part by the fact that "the provision in the South Dakota statute" at issue there "denie[d] habitual criminals the possibility of parole").  We have expressly concluded that whether a sentence is parole eligible is relevant during an abbreviated proportionality review because parole can reduce the actual period of confinement and render the penalty less harsh.  *See Drake*, 785 P.2d at 1275.

## 2. Extended Proportionality Review (Step Two)

¶15    Consistent with *Harmelin*'s reading of *Solem*, we have established that, while reviewing courts must complete an abbreviated proportionality review (step one) whenever a defendant challenges his sentence on proportionality grounds, it is not appropriate for them to conduct an extended proportionality review (step two) unless the abbreviated proportionality review gives rise to an inference of gross disproportionality.  *See Harmelin*, 501 U.S. at 1004; *Deroulet*, 48 P.3d at 524.  In the rare situation in which the analysis advances to step two, however, our cases are

11

not in complete harmony with *Solem* and *Harmelin*. The difference, though, is not intentional. It is the result of some confusion our caselaw has inadvertently created regarding intrajurisdictional comparisons, one of the two categories of comparisons prescribed in *Solem* and discussed in *Harmelin*.

¶16 *Close* incorrectly described intrajurisdictional comparisons as involving "the sentences imposed on other criminals who commit *the same crime* in the same jurisdiction." 48 P.3d at 534 (emphasis added). *Deroulet* did the same. 48 P.3d at 524 (referring to "a comparison of the sentences imposed on other criminals who commit *the same crime* in the same jurisdiction" (emphasis added)). And divisions of the court of appeals have consistently followed suit. *See, e.g.*, *People v. Hargrove*, 2013 COA 165, ¶ 13, 338 P.3d 413, 417 (same). But the Court in *Solem* had something else in mind. It was not concerned with sentences imposed on other criminals in the jurisdiction for *the same crime*. Rather, it directed courts to compare the challenged sentence to sentences for *other crimes* in the same jurisdiction. It explained that, "[i]f *more serious crimes* are subject to the same penalty, or to less serious penalties, that is some indication that the punishment at issue may be excessive." *Solem*, 463 U.S. at 291 (emphasis added). *Harmelin* confirmed this—it referred to a "comparative analysis" of "sentences imposed for *other crimes*" in the same jurisdiction. 501 U.S. at 1004 (emphasis added). Thus, the intrajurisdictional comparisons *Solem* envisioned were to sentences for *other crimes*.

12

¶17 We now clarify that, in conformity with federal precedent, Colorado courts conducting an extended proportionality review should compare the sentence at issue to (1) sentences for other crimes in the same jurisdiction and (2) sentences for the same crime in other jurisdictions. To the extent our prior cases have provided contrary instructions, they have done so incorrectly.

### 3. Summary of Colorado Law on Proportionality Review

¶18 As a recap of Colorado law on proportionality review, we hope that the following flowchart can assist in understanding this relatively complex analysis:

# PROPORTIONALITY REVIEW



## II. Habitual Criminal Punishment

## A. General Principles

¶19    Section 18-1.3-801, C.R.S. (2019), governs habitual criminal punishment in Colorado.   As pertinent here, when a defendant is convicted of a felony (a triggering offense), he may be adjudicated a habitual criminal if he "has been three times previously convicted . . . of a felony" based on charges separately brought and tried that arose out of separate and distinct criminal episodes (predicate offenses).  § 18-1.3-801(2)(a)(I).  A defendant adjudicated a habitual criminal based on three or more predicate offenses must be punished for the triggering offense "by imprisonment in the department of corrections for a term of four times the maximum of the presumptive range . . . for the class or level of felony" of the triggering offense.   § 18-1.3-801(2)(a)(I)(A).   However, as we discuss later in the Analysis section, there is a provision in section 18-1.3-801 that shields certain drug felonies from habitual criminal punishment.  *See* § 18-1.3-801(2)(b).[7]

## B. Proportionality Review of a Habitual Criminal Sentence

¶20    We have cautioned that "the Habitual Criminal Act create[s] a unique possibility" that a defendant will receive a sentence that "is not proportionate to the crime for which [he] has been convicted."  *Alvarez v. People*, 797 P.2d 37, 40

---

[7] There is also a provision in section 18-1.3-801 that renders some escape offenses ineligible for habitual criminal punishment, *see* § 18-1.3-801(5), but that provision is not relevant here.

15

(Colo. 1990). The concern lies in the "formulaic and formalistic nature" of the habitual criminal statute. *Deroulet*, 48 P.3d at 526. By increasing a defendant's punishment based on mandatory provisions, the habitual criminal statute "strip[s] the sentencing court of any discretion in sentencing." *Close*, 48 P.3d at 540. Indeed, the only discretion exercised in the imposition of a habitual criminal sentence is by the prosecution when it decides whether to seek to adjudicate the defendant a habitual criminal. *See id.*

¶21 Nevertheless, we have emphasized "that in most instances the General Assembly's determinations regarding the sentencing of habitual criminals will result in constitutionally proportionate sentences." *Deroulet*, 48 P.3d at 526. Hence, we have predicted that in habitual criminal cases, as in other cases raising Eighth Amendment challenges, an abbreviated proportionality review will almost always yield a finding that the sentence is not unconstitutionally disproportionate, thereby protecting "the primacy of the General Assembly in crafting sentencing schemes." *Id.* It follows that an extended proportionality review is just as rare in this context as it is when the sentence is not based on the defendant's status as a habitual criminal.

¶22 This begs the question of how to properly apply *Harmelin* in the context of a habitual criminal sentence. In *Ewing*, the plurality used *Harmelin* as a guidepost, but explained that in weighing gravity or seriousness, it had to "place on the scales

16

not only [Ewing's] current felony, but also his long history of felony recidivism." 538 U.S. at 29. *Ewing*'s plurality worried that any other approach would fail to accord proper deference to the legislature's policy judgments in its choice of sanctions for repeat offenders. *Id.* (pointing out that the State's interest in enacting the three-strikes law was not in simply punishing the offense of conviction; it was also "in dealing in a harsher manner with those who by repeated criminal acts have shown that they are simply incapable of conforming to the norms of society as established by its criminal law" (quoting *Rummel v. Estelle*, 445 U.S. 263, 276 (1980))). The plurality reasoned that any proportionality review of Ewing's sentence needed to consider this legitimate penological goal. *Id.* In holding that Ewing's sentence, though harsh, was constitutional, the plurality concluded that "Ewing's [was] not 'the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.'" *Id.* at 30 (quoting *Harmelin*, 501 U.S. at 1005 (Kennedy, J., concurring in part and concurring in the judgment)).

¶23 Concordant with the plurality opinion in *Ewing*, in Colorado, when the proportionality of a habitual criminal sentence is challenged, the grave or serious inquiry includes consideration of the defendant's history of felony recidivism. The two subparts in step one entail an analysis of: (1) the gravity or seriousness of all the offenses in question—the triggering offense and the predicate offenses; and

17

(2) the harshness of the sentence imposed on the triggering offense. *See Rutter v. People*, 2015 CO 71, ¶ 18, 363 P.3d 183, 188. The court must scrutinize the triggering offense and the predicate offenses and determine whether in combination they are so lacking in gravity or seriousness so as to suggest that the sentence is unconstitutionally disproportionate to the crime, taking into account the defendant's eligibility for parole. *Id.*

¶24 If there are multiple triggering offenses, the reviewing court must look at the sentence imposed for each such offense and engage in a proportionality review of that sentence because each sentence represents a separate punishment for a distinct and separate crime. *See Close*, 48 P.3d at 538–39.[8] As to each sentence, the inquiry is whether the corresponding triggering offense and the predicate offenses, considered together, are so lacking in gravity or seriousness as to suggest that the sentence is grossly disproportionate. *Id.* at 540. If the proportionality review assessed instead the cumulative effect of the sentences imposed on all the triggering offenses, it could result in an inference of gross disproportionality merely because the defendant committed multiple crimes.

---

[8] *Close* involved consecutive crime-of-violence sentences. 48 P.3d at 538. But we do not read the scope of our analysis there to be limited to consecutive sentences or to sentences imposed pursuant to the crime-of-violence statute. In our view, the rationale applies with equal force to habitual criminal sentences, regardless of whether they were ordered to be served consecutively or concurrently.

¶25 We note that our proportionality cases appear to have muddied the waters a bit in the habitual criminal context as well. We pause to clarify them.

¶26 In *Gaskins*, we said that "[t]he rule to be gleaned" from our earlier cases is "that only an abbreviated review is necessary when the crimes supporting a habitual criminal sentence include grave or serious offenses and when the defendant will become eligible for parole." 825 P.2d at 36. We repeated this comment in *Close* and *Deroulet*, adding that it was supported by *Gaskins*'s adoption of the "rule of *Harmelin*." *Close*, 48 P.3d at 537; *Deroulet*, 48 P.3d at 524; *see also Rutter*, ¶ 18, 363 P.3d at 188 ("[A]n abbreviated proportionality review is s ufficient when the crimes supporting a sentence imposed under the habitual criminal statute include grave or serious offenses."). But this view is problematic for five reasons: (1) it improperly implies that the harshness of the penalty can be disregarded; (2) it suggests that the outcome of an abbreviated proportionality review under these circumstances will always be a finding of no inference of gross disproportionality; (3) it finds no support in *Harmelin*, *Ewing*, or any other Supreme Court case; (4) it fails to indicate whether it refers to triggering offenses, predicate offenses, or both; and (5) it does not specify how many of the offenses involved must be grave or serious.

¶27 We take this opportunity to make clear that even when the triggering offenses and/or the predicate offenses supporting a habitual criminal sentence

include grave or serious crimes and the defendant is parole eligible, a court conducting a proportionality review must follow the analytical framework we set forth in this opinion. Thus, it would be improper for a court to skip the second subpart of an abbreviated proportionality review and neglect to consider the harshness of the penalty or to conclude that when the circumstances described are present there can be no inference of gross disproportionality.

¶28 With this in-depth overview of the pertinent legal principles as a backdrop, we now turn to the facts and procedural history of this case.

### III. Facts and Procedural History

¶29 In June 2012, Pat Crouch, an undercover agent with the Colorado Bureau of Investigation, received information from a confidential informant that Belinda May Wells-Yates was stealing identity documents from cars. He arranged a meeting with Wells-Yates during which she sold him a birth certificate, a social security card, and a New Mexico driver's license. Before the meeting ended, Wells-Yates raised the prospect of future transactions, including the sale of opioids and guns.

¶30 Several days later, the Waldo Canyon fire started. When the fire had spread to a large area, Wells-Yates told the agent that she was "chasing the fire" —stealing property from homes that had been evacuated. The agent scheduled another meeting with her during which she sold him stolen property, including

jewelry, coins, musical instruments, power tools, electronics, and business checks. After that meeting, Wells-Yates was arrested. A search of Wells-Yates and her belongings revealed a bag containing a small amount of methamphetamine, a set of scales, small plastic bags, and other drug paraphernalia. As part of the ensuing investigation, the agent learned that Wells-Yates had also stolen personal checks and had used a stolen gas card to purchase gasoline for multiple vehicles.

¶31 The prosecution charged Wells-Yates in 2012 with second degree burglary, conspiracy to commit second degree burglary, theft, possession with intent to sell or distribute 7 grams or less of a schedule II controlled substance (methamphetamine), four counts of identity theft, and three habitual criminal counts. In February 2013, a jury found Wells-Yates guilty of all the substantive charges. Following a bench trial in May 2013, the court adjudicated her a habitual criminal based on three predicate offenses:

- A 1996 conviction for possession with intent to sell or distribute 7 grams or less of a schedule II controlled substance (methamphetamine), a class 3 felony;

- a 1997 conviction for possession of 2 grams or less of a schedule II controlled substance (methamphetamine), a class 4 felony; and

- a 1999 conviction for possession of 2 grams or less of a schedule II controlled substance (methamphetamine), a class 4 felony.

¶32     The court subsequently conducted a sentencing hearing.  For each of the eight triggering offenses, it imposed the statutorily required prison sentence — four times the maximum prison term in the presumptive range:

- 48 years (12 × 4) on count 1, second degree burglary, a class 3 felony;

- 24 years (6 × 4) on count 2, conspiracy to commit second degree burglary, a class 4 felony;

- 24 years (6 × 4) on count 3, theft, a class 4 felony;

- 48 years (12 × 4) on count 4, possession with intent to sell or distribute 7 grams or less of a schedule II controlled substance (methamphetamine), a class 3 felony;[9] and

- 24 years (6 × 4) on each of the four class 4 felony counts of identity theft (counts 5, 6, 7, and 12).

¶33     The court ordered all of the sentences, with the exception of the sentence on count 7, to be served concurrently.[10]  In total, Wells-Yates received an aggregate prison term of 72 years: 24 years on count 7, consecutive to all the other sentences

---

[9] The parties agree that the sentence on count 4 was incorrectly calculated; it should have been 64 years, not 48 years.  Possession with intent to sell or distribute 7 grams or less of methamphetamine on the date charged in count 4 was an extraordinary risk class 3 felony, *see* § 18-1.3-401(10)(b)(XI), C.R.S. (2012); the maximum term of years in the presumptive range for such a felony is 16, not 12, years, *see* § 18-1.3-401(1)(a)(V)(A), C.R.S. (2019).  Therefore, the trial court should have multiplied 16 × 4, not 12 × 4.

[10] The basis of count 7 was the sale of the identity documents during Wells-Yates's first meeting with the agent; the sentence on that count was ordered to be served consecutive to all the other sentences.

(the longest of which were the 48-year concurrent sentences on counts 1 and 4).[11]

She is eligible for parole.

¶34    Wells-Yates advanced a proportionality challenge. After conducting an abbreviated proportionality review of the aggregate prison term, the trial court found that it was not unconstitutionally disproportionate. A division of the court of appeals affirmed. Wells-Yates then filed a petition for certiorari review, which we granted in part.[12]

---

[11] Given the error regarding the sentence on count 4, the parties agree that Wells-Yates should have received an aggregate prison term of 88, not 72, years (24 + 64, instead of 24 + 48).

[12] We granted certiorari to review the following five issues:

1. Whether a 72-year prison sentence based on a defendant's habitual offender status is grossly disproportionate when the defendant has only three prior felony drug possession convictions, which the legislature has re-classified and which could no longer be used to quadruple a defendant's sentence.

2. Whether a court, when conducting an abbreviated proportionality review of a habitual sentence, can consider the General Assembly's subsequent reclassification of a crime or amendment of the habitual criminal statute that made an underlying crime inapplicable for purposes of habitual criminal adjudication.

3. Whether this Court in *Rutter v. People*, 2015 CO 71, 363 P.3d 183, intended to overrule its prior precedent establishing that courts must look at both the triggering conviction and prior convictions in combination when assessing whether a sentence is disproportionate under the Eighth Amendment.

4. Whether this Court's announcement in *People v. Deroulet*, 48 P.3d 520 (Colo. 2002), that all narcotics-related offenses are per se grave

23

## IV. Standard of Review

¶35 Whether a sentence is grossly disproportionate in violation of the Eighth Amendment to the U.S. Constitution and article II, section 20 of the Colorado Constitution is a question of law, not a sentencing decision requiring deference to the trial court. *People v. Mershon*, 874 P.2d 1025, 1035 (Colo. 1994). Therefore, our review is de novo. *Rutter*, ¶ 12, 363 P.3d at 187.

## V. Analysis

¶36 Having generally discussed the relevant law and facts, and having set forth the governing standard of review, we are finally ready to address the five issues we agreed to consider in this appeal. We analyze each in turn.

### A. To Determine Gravity or Seriousness, Should the Triggering and Predicate Offenses Be Considered Together?

¶37 Wells-Yates maintains that courts should consider the triggering offense and the predicate offenses together in determining gravity or seriousness during an abbreviated proportionality review. The prosecution agrees. We do too. *See Gaskins*, 825 P.2d at 36. To the extent that our decision in *Rutter* may be construed otherwise, this opinion serves as clarification.

---

and serious should be revisited in light of recent legislative amendments to our drug laws.

5. Whether convictions for drug possession or drug possession-with-intent are grave and serious.

¶38    Here, though, there are eight triggering offenses, and the division lumped them all together and then determined whether, in combination, they were so lacking in gravity or seriousness as to give rise to an inference that *the aggregate prison term of 72 years* is grossly disproportionate.[13]  Wells-Yates urges us to accept this methodology.  But we decline to do so because the division was required to decide whether each triggering offense and the predicate offenses, in combination, are so lacking in gravity or seriousness as to give rise to an inference that the sentence imposed *on that particular triggering offense* is grossly disproportionate.  *Id.* Hence, for example, the division should have considered whether the triggering offense of second degree burglary and the three predicate offenses, in combination, are so lacking in gravity or seriousness as to suggest that the 48-year sentence imposed on that triggering offense is grossly disproportionate.

¶39    Because the division's analysis is inconsistent with today's holding, we conclude that it is erroneous.  Therefore, we reverse the division's judgment.

---

[13] The division appears to have ignored the predicate offenses in this part of the analysis.

## B. Should Relevant Statutory Amendments Enacted After the Dates of the Triggering and Predicate Offenses Be Considered During an Abbreviated Proportionality Review?

¶40 Wells-Yates argues that, during the abbreviated proportionality review (step one), the trial court should have factored in relevant legislative amendments enacted after the dates of the triggering and predicate offenses. The prosecution counters that such statutory changes may only be considered during an extended proportionality review (step two). Before settling the parties' dispute, we examine the pertinent amendments.

¶41 Recall that the prosecution proved three predicate offenses, one for possession with intent to sell or distribute 7 grams or less of methamphetamine and two for possession of 2 grams or less of methamphetamine. More than a decade after Wells-Yates committed these offenses, the General Assembly amended the drug and habitual criminal statutes. More specifically, in 2010, it *prospectively* reclassified the possession of 2 grams or less of methamphetamine from a class 4 to a class 6 felony.[14] *See* Ch. 259, sec. 4, § 18-18-403.5(2)(b)(I), 2010 Colo. Sess. Laws 1162, 1165. The following year, the legislature amended the

---

[14] Class 6 felonies carry a presumptive term of imprisonment of 12 to 18 months, which is significantly less severe than the presumptive term of imprisonment of 2 to 6 years for class 4 felonies. § 18-1.3-401(1)(a)(V)(A.1) (applying to felonies committed on or after July 1, 2018); *see also* § 18-1.3-401(1)(a)(V)(A) (applying to felonies committed on or after July 1, 1993, and before July 1, 2018).

habitual criminal statute to make it inapplicable to a class 6 felony for possession of methamphetamine. *See* Ch. 57, sec. 1, § 18-1.3-801(2)(b), 2011 Colo. Sess. Law 151, 151. But, like the reclassification change from the previous year, this amendment was expressly declared prospective, not retroactive. *See Hargrove*, ¶ 28, 338 P.3d at 419 (citing Ch. 57, sec. 1, § 18-1.3-801(2)(b), 2011 Colo. Sess. Laws 151, 151–52).

¶42 Two years later, effective October 1, 2013, the legislature reclassified possession with intent to sell or distribute 7 grams or less of methamphetamine —one of the triggering offenses for which Wells-Yates was sentenced just months earlier in this case and also one of her predicate offenses—from an extraordinary risk class 3 felony to a level 3 drug felony.[15] *See* Ch. 333, sec. 10, § 18-18-403.5(2)(c), 2013 Colo. Sess. Laws 1900, 1909–13. At the same time, the legislature transformed class 6 felonies for possession of methamphetamine into level 4 drug felonies; level 4 drug felonies carry a presumptive term of imprisonment of 6 to 12 months, which is less severe than the presumptive term of imprisonment for class 6 felonies. *See* Ch. 333, sec. 8, § 18-18-403.5(2)(a), 2013 Colo. Sess. Laws 1900, 1908. *Compare*

---

[15] Level 3 drug felonies are not extraordinary risk crimes; they carry a presumptive term of imprisonment of 2 to 4 years, which is significantly less severe than the presumptive term of imprisonment of 4 to 16 years for extraordinary risk class 3 felonies. *Compare* § 18-1.3-401.5(2)(a), C.R.S. (2019), *with* § 18-1.3-401(1)(a)(V)(A), (10)(a).

§ 18-1.3-401(1)(a)(V)(A), C.R.S. (2019), *with* § 18-1.3-401.5(2)(a), C.R.S. (2019). Then, effective October 1, 2013, the legislature excluded from the scope of the habitual criminal statute all level 4 drug felonies for possession of methamphetamine when the quantity possessed "is not more than . . . two grams." *See* Ch. 333, sec. 36, § 18-1.3-801(2)(b), 2013 Colo. Sess. Laws 1900, 1927–28; Ch. 333, sec. 71, § 18-1.3-801(2)(b), 2013 Colo. Sess. Laws 1900, 1943.

¶43 In other words, since Wells-Yates's two predicate offenses of possession of 2 grams or less of methamphetamine, the legislature has reclassified that crime from a class 4 felony that is eligible to be both a triggering offense and a predicate offense for habitual criminal purposes to a level 4 drug felony that carries less severe penalties and is not so eligible. And since both of Wells-Yates's offenses for possession with intent to sell or distribute 7 grams or less of methamphetamine — one of the triggering offenses and one of the predicate offenses — the legislature has reclassified that crime from an extraordinary risk class 3 felony to a level 3 drug felony that carries less severe penalties and is not considered an extraordinary risk crime. These changes mean that, had Wells-Yates committed the triggering offense of possession with intent on or after October 1, 2013, instead of in 2012, she would have faced a prison sentence of 2 to 4 years, not a mandatory habitual criminal sentence of 64 years.

¶44    The General Assembly's amendments were of no moment to the division. But the majority of the divisions of the court of appeals have taken a different view. *See People v. Anaya*, 894 P.2d 28, 32 (Colo. App. 1994) ("[W]hen the General Assembly subsequently amends a criminal sentencing statute, even though the [amended] statute is to be applied prospectively, the trial court may properly consider it when determining whether a defendant's sentence was grossly disproportionate."); *accord People v. Loris,* 2018 COA 101, ¶ 13, 434 P.3d 754, 757 ("[A] court should also consider the General Assembly's current evaluation of the seriousness of the offense at issue, including any relevant amendments to criminal sentencing statutes."); *Hargrove*, ¶¶ 18–20, 338 P.3d at 418 (finding that a subsequent amendment to the habitual criminal statute, which did not apply to Hargrove's escape conviction, could nevertheless be considered for purposes of determining whether that conviction was grave or serious); *People v. Patnode*, 126 P.3d 249, 261 (Colo. App. 2005) (explaining that, while a subsequent reclassification of an offense did not preclude use of Patnode's two prior offenses under the habitual criminal statute, it was "appropriate to consider such a legislative amendment in assessing the relative gravity and seriousness of the offense").

¶45    We agree with the majority approach. In determining the gravity or seriousness of the offense during an abbreviated proportionality review, the trial

court should consider relevant legislative amendments enacted after the date of the offense, even if the amendments do not apply retroactively. Further, when undertaking this analysis with respect to a habitual criminal sentence, the court should consider any relevant legislative amendments related to the triggering offense and the predicate offenses.

¶46 That one or more of the offenses involved may previously have been designated per se grave or serious does not alter these conclusions.[16] The Supreme Court has reasoned that whether a sentence contravenes the Eighth Amendment requires courts to "look beyond historical conceptions to 'the evolving standards of decency that mark the progress of a maturing society.'" *Graham v. Florida*, 560 U.S. 48, 58 (2010) (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)). And the "clearest and most reliable objective evidence" of these evolving standards "is the legislation enacted by the country's legislatures." *Atkins v. Virginia*, 536 U.S. 304, 312 (2002) (quoting *Penry v. Lynaugh*, 492 U.S. 302, 331 (1989)); *see also Stanford v. Kentucky*, 492 U.S. 361, 370 (1989) ("'[F]irst' among the 'objective indicia that reflect the public attitude toward a given sanction' are statutes passed by society's elected representatives." (quoting *McCleskey v. Kemp*, 481 U.S. 279, 300 (1987))), *abrogated on other grounds by Roper v. Simmons*, 543 U.S. 551 (2005).

---

[16] Wells-Yates asserts that *Rutter* created confusion on this point. Even if she is correct, this opinion provides any needed clarification.

30

¶47 Thus, the division should have considered the statutory amendments in question as objective indicia of the evolving standards of decency to determine the gravity or seriousness of the triggering offense of possession with intent and of the three predicate offenses. The amendments demonstrate that, starting in 2010, there has been a sea change in our General Assembly's philosophy regarding the handling of drug offenses, with treatment now heavily favored over incarceration. These reliable indicia of the evolving standards of decency in Colorado are relevant to any proportionality challenge that includes drug offenses.

¶48 We are not persuaded otherwise by the prosecution's reliance on the legislature's choice to make the amendments prospective instead of retroactive. Whether statutory revisions apply retroactively "is a separate and distinct question from whether a defendant's sentence is constitutionally proportionate." *Rutter*, ¶ 35, 363 P.3d at 191 (Gabriel, J., dissenting). Consideration of the statutory changes as the most valid indicia of Colorado's evolving standards of decency is not equivalent to the retroactive application of those changes. *See Humphrey v. Wilson*, 652 S.E.2d 501, 507 & n.41 (Ga. 2007) (determining that the "seismic shift in the legislature's view of the gravity of" the defendant's offense, though not retroactively applicable to his conviction, was "a factor representative of the evolving standard regarding the appropriate punishment" for the offense).

31

¶49 The prosecution posits, though, that the legislative changes on which Wells-Yates relies are relevant only during an extended proportionality review. This position incorrectly likens consideration of legislative changes to a comparative analysis of Wells-Yates's sentences and sentences imposed on other defendants under current Colorado law. We do not require a comparison of the challenged sentences to other sentences—at least not during an abbreviated proportionality review (step one). Rather, we simply rule that, during the first subpart of the abbreviated proportionality review, the division should have considered any relevant legislative changes as the best evidence of our evolving standards of decency.

¶50 We find equally unconvincing the prosecution's claim that neither the classification of a crime nor the punishment prescribed for it is trustworthy evidence of the legislature's view of the gravity or seriousness of the crime. Of course it is. Colorado's criminal classifications and sentencing schemes clearly reflect that the more grave or serious an offense, the more serious the level of classification assigned and the harsher the punishment prescribed. In *Mershon*, we relied on the classification of the offenses and the punishment prescribed for them in disagreeing with the trial court's conclusion that crimes of violence were inherently more grave or serious than heroin offenses. 874 P.2d at 1033–34. We observed that at that time heroin offenses and many violent crimes were classified

as class 3 felonies and subject to identical punishment. *Id.* at 1034. Such similarities, we reasoned, suggested that the legislature "viewed violent crimes and heroin trafficking crimes to be equally serious." *Id.* We added that, while not determinative, "the legislature's assessment of the seriousness of particular offenses is entitled to great deference." *Id.*; *see also Patnode*, 126 P.3d at 261 (finding that the decision to change the classification of an offense from a felony to a misdemeanor "indicate[d] the General Assembly's conclusion that the offense [was] not grave and serious").

¶51 The prosecution insists, however, that the recent statutory amendments are not proof that drug offenses are less grave or serious than they used to be, but instead reflect the legislature's attempt to find an alternative solution to a persistent problem. This contention presents a false choice. There is no question that the General Assembly's statutory modifications were motivated by its desire to find a more effective approach to drug offenses and that it ultimately settled on emphasizing treatment and deemphasizing imprisonment. *See generally* § 18-18-401(1) (reciting the legislature's findings, determinations, and declarations in amending some narcotics-related statutory provisions). But these changes simultaneously signal the legislature's recognition that drug offenses are generally less grave or serious than previously thought and deserve less severe punishment than other crimes. *Id.*; *see also* § 18-1.3-103.5(2)(a), C.R.S. (2019) (allowing some

33

drug convictions to be vacated upon successful completion of a probation or community corrections sentence); § 18-1.3-104.5, C.R.S. (2019) (requiring that all reasonable alternative sentencing options be exhausted before a prison sentence is imposed for some drug convictions).

¶52 We likewise disagree with the prosecution that the gravity or seriousness of an offense should be ascertained as of the date the offense was committed, including by consulting the relevant statutes in effect at that time. Inasmuch as analysis under the Eighth Amendment and article II, section 20 is concerned with evolving standards of decency related to *punishment*, legislative enactments that take effect after the date of the offense and have no retroactive application may nevertheless be relevant to evaluate the gravity or seriousness of the offense.

¶53 Because the division did not consider the statutory changes at issue, it erred. Therefore, we reverse its judgment.

## C. Should All Narcotics-Related Offenses Be Deemed Per Se Grave or Serious?

¶54 Wells-Yates urges us to rid ourselves entirely of the per se grave or serious designation in the context of an abbreviated proportionality review. Because this question is not before us and has not been fully briefed, we decline the invitation to address it. Instead, our focus is narrower: Should all narcotics-related offenses continue to be considered per se grave or serious in Colorado? For five reasons, we answer no.

¶55 First, a careful look at its genesis reveals that the contested designation is premised on a misreading of *Gaskins*. Both *Close* and *Deroulet* cited *Gaskins* for the proposition that all narcotic offenses had previously been determined to be inherently grave or serious in Colorado. *Close*, 48 P.3d at 537; *Deroulet*, 48 P.3d at 524. But *Gaskins* referred to the "*sale* of narcotic drugs" as being inherently grave or serious. *Gaskins*, 825 P.2d at 37 (emphasis added). It said nothing about other narcotic offenses, and it certainly did not declare that all narcotic offenses are inherently grave or serious.

¶56 True enough, *Deroulet* also cited *People v. Cisneros*, 855 P.2d 822, 830 (Colo. 1993), in observing that our court had "previously held that *the possession* or sale of narcotics is a grave or serious offense." *Deroulet*, 48 P.3d at 527 (emphasis added). However, *Cisneros* took the same misstep *Close* and *Deroulet* did: It relied on *Gaskins* for a principle that *Gaskins* cannot support—namely, the designation of the possession of narcotics as inherently grave or serious. *Cisneros*, 855 P.2d at 830. And, though *Cisneros* also cited *Harmelin* for this proposition, *id.*, that citation is no more useful (or accurate) because *Harmelin* did not hold that the possession of narcotics—no matter how small the quantity involved—is inherently grave or serious.

¶57 To be sure, *Harmelin* both observed that the possession of narcotics "threatened to cause grave harm to society" and alluded to "the pernicious effects

35

of the drug epidemic in this country."  501 U.S. at 1002–03.  Drug offenses in general, explained *Harmelin*, "represent 'one of the greatest problems affecting the health and welfare of our population.'"  *Id.* at 1002 (quoting *Nat'l Treasury Emp. Union v. Von Raab*, 489 U.S. 656, 668 (1989)).  But the analysis didn't end there.  It also included consideration of the specific facts and circumstances surrounding Harmelin's offense—he had possessed "more than 650 grams (over 1.5 pounds) of cocaine," which had "a potential yield of between 32,500 and 65,000 doses."  *Id.* *Harmelin* reasoned that, "[f]rom any standpoint," the specific possession crime at issue there fell "in a different category from the relatively minor, nonviolent crime" of passing a worthless check in *Solem*.  *Id.*  Stated differently, *Harmelin* did not conclude that all drug possession crimes are grave or serious irrespective of the surrounding facts and circumstances.  Nor is the rule of *Harmelin* that a life sentence without parole can be imposed on any drug possession crime without ever running afoul of the Eighth Amendment.

¶58    Second, the recent legislative amendments impacting drug offenses militate against preserving a blanket rule rendering all such offenses inherently grave or serious.  The General Assembly treats most drug felonies as substantially less grave or serious today than it has in the past, and this adjustment is the best evidence of the views held by our maturing society, as expressed through its representatives in the legislature.

¶59 Relatedly, the legislature does not treat all drug felonies equally. For example, someone convicted of a level 1 drug felony faces a maximum presumptive sentence of 32 years in prison and a $1,000,000 fine. § 18-1.3-401.5(2). On the other hand, someone convicted of a level 4 drug felony faces a maximum presumptive sentence of 1 year in prison and a $100,000 fine. *Id.* Given this ocean of difference in legislative treatment, we are disinclined to label all drug felonies per se grave or serious. This is particularly the case considering that the significant reduction in the punishment prescribed for some drug felonies reflects that they are now deemed less grave or serious than the vast majority of felony offenses. The recent changes to the habitual criminal statute are illustrative: Possession of 2 grams or less of methamphetamine is among the select felonies that the legislature has exempted from habitual criminal punishment. § 18-1.3-801(2)(b).

¶60 Third, because drug offenses encompass a wide spectrum of conduct, we believe that the most prudent course of action is to refrain from painting them all with the same broad brush. It makes little sense to automatically treat the sale of a large quantity of cocaine by the leader of a drug cartel as equally grave or serious as the mere possession of a very small quantity of cocaine by a drug addict who is not involved in sale or distribution.

¶61 Fourth, as we have discussed, delineating certain crimes as per se grave or serious has no basis in Supreme Court jurisprudence and is unique to Colorado law. Therefore, the label should be used judiciously and deliberately.

¶62 Lastly, designating a crime per se grave or serious has significant consequences and courts should therefore do so cautiously. Once a crime has been deemed per se grave or serious, courts skip the first subpart of step one of an abbreviated proportionality review (gravity or seriousness) and proceed directly to the second subpart of that step (harshness of the penalty). What's more, any review in the second subpart is substantially circumscribed because the legislature's establishment of the harshness of the penalty deserves great deference. *Close*, 48 P.3d at 538; *Deroulet*, 48 P.3d at 526. Consequently, a per se grave or serious designation "renders a sentence nearly impervious to attack on proportionality grounds." *Close*, 48 P.3d at 538. This concern is magnified in the habitual criminal context, where every sentence under review has been imposed without the trial court's exercise of discretion. *Id.* at 540.

¶63 Accordingly, we now conclude that the designation of per se grave or serious for purposes of a proportionality review must be reserved for those rare crimes which, based on their statutory elements, necessarily involve grave or serious conduct. Put differently, a crime should not be designated per se grave or serious unless the court concludes that the crime would be grave or serious in

every potential factual scenario. Using the designation otherwise is fraught with peril.

¶64 Robbery is a perfect example of the type of crime that is appropriately viewed as per se grave or serious. No matter what facts and circumstances may be involved, if a defendant is convicted of robbery, it necessarily means that he knowingly took something of value from the person or presence of another by the use of force, threats, or intimidation. § 18-4-301(1), C.R.S. (2019). Thus, robbery, by its very nature, involves knowing conduct and grave harm (or the threat of grave harm) to the victim or society (or both). *See Solem*, 463 U.S. at 292. As such, it fits the standard we articulate today: A conviction for robbery is per se grave or serious because it will always involve knowing conduct and grave harm (or the threat of grave harm) to the victim or society (or both).

¶65 Aggravated robbery, burglary,[17] accessory to first degree murder, and the sale or distribution of narcotics—the other crimes we have previously designated inherently grave or serious—satisfy the standard we announce today as well.[18]

---

[17] Because the question is not before us, we do not address whether the designation of burglary as a per se grave or serious crime extends to third degree burglary, which includes breaking into a coin vending machine, *see* § 18-4-204(1), C.R.S. (2019), or even second degree burglary, which includes unlawfully remaining in a building or occupied structure after a lawful entry with the intent to commit therein a crime against property, *see* § 18-4-203(1), C.R.S. (2019).

[18] Attempted burglary, conspiracy to commit burglary, and felony menacing were included in *Close*'s list of per se grave or serious crimes, *see* 48 P.3d at 538, but were

The statutory elements of these offenses ensure that, regardless of the facts and circumstances involved, a defendant who stands convicted of any such offense will have committed a crime that is necessarily grave or serious.

¶66 We cannot say the same about all narcotic crimes. We have held that the sale or distribution of any quantity of narcotics is inherently grave or serious because it causes "grave societal harm." *See Gaskins*, 825 P.2d at 37. But based on the elements of a different drug offense, the underlying conduct may not always be grave or serious. Indeed, we conclude next that the drug offenses of possession and possession with intent should no longer be considered per se grave or serious.

¶67 Because the division determined that all narcotic offenses should continue to be designated per se grave or serious, it erred. We therefore reverse its judgment.

## D. Should Possession and Possession With Intent Be Deemed Per Se Grave or Serious?

¶68 We conclude that the possession of narcotics and the possession with intent to sell, distribute, manufacture, or dispense narcotics should no longer be considered per se grave or serious. We take up possession first and then analyze possession with intent.

---

simultaneously omitted from the list of per se grave or serious crimes in *Deroulet*, *Close*'s companion case, *see* 48 P.3d at 524. We need not, and therefore do not, decide whether these crimes should be considered per se grave or serious.

¶69 Given that we have determined that not all narcotic offenses are per se grave or serious, and given further that possession is among the least (and arguably the least) grave or serious of all drug offenses, we have little difficulty declaring that possession should no longer be considered per se grave or serious. Of course, possession may be grave or serious—such as when a defendant possesses a large quantity of narcotics. *See Harmelin*, 501 U.S. at 1002. But whether it is should turn on the facts and circumstances surrounding the specific crime committed—i.e., based on consideration of the harm caused or threatened to the victim or society and the offender's culpability. *See Solem*, 463 U.S. at 292. The point is that this must be an individualized determination.

¶70 Possession with intent is a much closer question. It involves more than mere possession, which we just determined is not per se grave or serious, but it involves less than sale or distribution, which we have long considered per se grave or serious. Although we anticipate that many convictions for possession with intent will be grave or serious, we believe that the wiser approach is to require a case-by-case evaluation.

¶71 Unlike aggravated robbery, robbery, burglary, accessory to first degree murder, and the sale or distribution of narcotics, possession with intent is not one of those crimes that we can predict with any degree of confidence will *always* be grave or serious. Given its statutory elements, possession with intent includes

wide-ranging conduct, not all of which rises to the level of grave or serious. For instance, an addict found in possession of baggies, a scale, and a very small quantity of narcotics may be convicted of possession with intent. Because there are facts and circumstances in which possession with intent cannot reasonably be deemed to belong in the same category as the offenses that are considered per se grave or serious, we cannot say that it is an inherently grave or serious crime. Instead, we conclude that the gravity or seriousness of possession with intent should be determined on a case-by-case basis by considering the surrounding facts and circumstances of the particular crime committed.

¶72    We recognize that the offenses of sale or distribution, on the one hand, and possession with intent, on the other, are set forth in the same statutory provision. *See* § 18-18-405(1)(a), C.R.S. (2019). Further, we acknowledge that a reasonable argument can be advanced that these crimes are sufficiently similar to warrant according both the per se designation. But we see a significant difference between them. Whatever quantity may be involved and whatever other facts and circumstances may be present, anyone convicted of sale or distribution will necessarily have engaged in grave or serious conduct because he will have knowingly sold or distributed narcotics. Possession with intent, however, refers to someone who, while intending to sell, distribute, manufacture, or dispense narcotics, does not actually do so. One of the factors *Solem* instructs us to look at

in determining gravity or seriousness is whether the crime involves a completed act versus an attempt to commit an act. *Solem*, 463 U.S. at 293. Possession with intent requires less than the completed (or even the attempted) sale, distribution, manufacture, or dispensation of narcotics; it requires simply an *intent* to sell, distribute, manufacture, or dispense narcotics. This is a compelling factor in our decision to refrain from designating possession with intent per se grave or serious, even though sale or distribution retains such designation.

¶73 Because the division concluded that possession and possession with intent are per se grave or serious, it erred. Therefore, we reverse its judgment.

### E. Is Wells-Yates's "72-Year Prison Sentence" Grossly Disproportionate?

¶74 Wells-Yates asks us to rule that her "72-year prison sentence" is grossly disproportionate. We decline to do so. To begin, Wells-Yates did not receive a 72-year prison sentence. She received multiple prison sentences, the aggregate of which is a 72-year imprisonment term. But that aggregate imprisonment term is not subject to proportionality review. Instead, as we explained earlier, the sentence for each triggering offense is entitled to an abbreviated proportionality review consistent with the guidance we provide in this opinion.

¶75 Moreover, we have concluded that the predicate offenses in this case are not per se grave or serious and that the triggering offense of possession with intent —the offense responsible for Wells-Yates's longest sentence—is likewise not per

43

se grave or serious. Therefore, the abbreviated proportionality review of the 64-year sentence required for the triggering offense of possession with intent will entail an analysis of the facts and circumstances surrounding that offense and the facts and circumstances surrounding each of the three predicate offenses. A similar factual analysis will be necessary for the proportionality review of the sentences imposed on the other seven triggering offenses because each sentence is affected by the gravity or seriousness of the predicate offenses, none of which is per se grave or serious.[19] Given that the trial court is "uniquely suited" to make these factual determinations, *see Gaskins*, 825 P.2d at 35, we remand to the court of appeals with instructions to return the case to the trial court for a new proportionality review with respect to each of Wells-Yates's sentences in accordance with this opinion.[20]

## VI. Conclusion

¶76    We hold that: (1) during an abbreviated proportionality review of a habitual criminal sentence, the court must consider each triggering offense and the predicate offenses together and determine whether, in combination, they are so

---

[19] We have not been called upon to decide in this case whether any of the other seven triggering offenses is per se grave or serious.

[20] We anticipate that in the vast majority of cases requiring a refined analysis of the facts and circumstances related to any triggering or predicate offense, the court's review will not be time-consuming or burdensome.

lacking in gravity or seriousness as to raise an inference that the sentence imposed on that triggering offense is grossly disproportionate; (2) in determining the gravity or seriousness of the triggering offense and the predicate offenses, the court should consider any relevant legislative amendments enacted after the dates of those offenses, even if the amendments do not apply retroactively; (3) not all narcotic offenses are per se grave or serious; and (4) the narcotic offenses of possession and possession with intent are not per se grave or serious. Because the division's decision is at odds with the conclusions we reach today, we reverse its judgment. Accordingly, we remand with instructions to return the case to the trial court for a new proportionality review consistent with this opinion.

**JUSTICE BOATRIGHT** concurs in the judgment.
**CHIEF JUSTICE COATS** dissents.

JUSTICE BOATRIGHT, concurring in the judgment.

¶77 I agree with Chief Justice Coats that the majority is engaging in an unnecessary "global rewrite of our proportionality jurisprudence" and is writing "so broadly" that its opinion effectively overturns "propositions long accepted by this court." Dis. op. ¶ 1. And I further agree that "the 'exceedingly rare' circumstance in which a term of years could successfully be challenged as disproportionate . . . is limited to an exceedingly, and necessarily, long term of years imposed for crime that is neither violent, grave, nor serious." *Id.* at ¶ 8 (internal citation omitted). I write separately, however, because I do agree with the majority that certain offenses that we previously determined are per se grave or serious need to be reexamined and that amendments to relevant statutes should be considered when conducting a proportionality review. Specifically, I agree with the majority that theft (as discussed in *Melton v. People*, 2019 CO 89, __ P.3d __) and mere possession of drugs should no longer be deemed per se grave or serious. Conversely, I respectfully disagree with the majority about the treatment of possession with intent to sell or distribute. In my view, any offense that includes the intent to sell or distribute drugs should remain per se grave or serious; hence, I concur in the judgment only and write separately to explain why.

¶78 First, the legislature recognizes that the sale or distribution of drugs and the possession with intent to sell or distribute are equally serious and should be

1

treated as such. After all, the two offenses are in the same statute. Section 18-18-405(1)(a), C.R.S. (2019), makes it unlawful to "knowingly . . . manufacture, dispense, sell, or distribute, *or* to possess with [the] intent to manufacture, dispense, sell, or distribute, a controlled substance" (emphasis added). In attempting to distinguish between sale or distribution and possession with intent to sell or distribute, the majority threads the needle so finely that it actually bifurcates the statute criminalizing these acts. Not only are sale or distribution and possession with intent to sell or distribute in the same statutory scheme, and not only are they in the very same subsection as each other, but they are in fact in the very same sentence of the statute. Despite that, the majority holds that some offenses falling under the exact same statute, section 18-18-405(1)(a), will be per se grave or serious while others will not, simply because of the point in time that they are detected. This cannot be what the legislature intended. In other words, the plain meaning of the statute evinces that the legislature recognizes that a person who is detected *after* a drug transaction is as equally culpable as a person who is caught *during* a drug transaction. This is simply common sense.

¶79 Despite the plain language of the statute, which leads to the conclusion that possession with intent to sell or distribute is treated equally with distribution itself, the majority overturns not only our precedent regarding possession with intent to sell or distribute drugs as per se grave or serious but the United States Supreme

2

Court's precedent as well. *See Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991) (Kennedy, J., concurring). Consistent with Supreme Court precedent, we have long maintained that the "[s]ale of narcotic drugs is viewed with great seriousness because of the grave societal harm caused by sale of illegal drugs and the evils associated with their use." *People v. Gaskins*, 825 P.2d 30, 37 (Colo. 1992). The majority appears to agree with this proposition because it allows for the sale or distribution of drugs to remain per se grave or serious under the standard it announces today. Maj. op. ¶ 71. But at the same time, the majority holds that possession with intent to sell or distribute is *not* per se grave or serious. *Id.* at ¶ 68. While the majority sees daylight between the two offenses, I do not; after all, the goal of a person committing either offense is exactly the same — to sell or distribute drugs. Therefore, in my view, the grave societal harm is equal for both offenses. Because of this, I fail to see how possession with intent to sell or distribute does not satisfy the majority's per se grave or serious standard announced today.

¶80 The majority holds that the standard for designating offenses per se grave or serious is whether the offense in question "necessarily involve[s] grave or serious conduct." *Id.* at ¶ 63. The majority goes on to state, albeit in its robbery analysis, that such offenses are those that "always involve knowing conduct and grave harm (*or the threat of grave harm*) to the victim or society (or both)." *Id.* at ¶ 64 (emphasis added). While the majority rightly remains convinced that the sale or

distribution of drugs involves knowing conduct and grave harm, it fails to recognize that possession with intent to sell or distribute threatens the very same grave harm that the actual sale or distribution produces. Regardless of which offense it is, there is always grave harm *or the threat of grave harm* to both the drug user, whose addiction is enabled and encouraged by sellers or distributors, as well as society, which is harmed by the myriad of consequences caused by the spread of illegal drug use. *See Harmelin*, 501 U.S. at 1002 (Kennedy, J., concurring) ("[U]se[] and distribution of illegal drugs represent 'one of the greatest problems affecting the health and welfare of our population.'" (quoting *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 668 (1989))).

¶81 The majority acknowledges that "[p]ossession with intent is a much closer question" than mere possession for per se grave or serious purposes. Maj. op. ¶ 70. But it elaborates that the reason for the closer question is that possession with intent to sell or distribute involves "less than sale or distribution, which we have long considered per se grave or serious." *Id*. Literally, that may be true: Sale or distribution is a completed act, while possession with intent to sell or distribute is—to use the majority's words—"less than" that completed act. In reality, this difference is one of happenstance. Under the majority's view, an individual who is caught selling or distributing a controlled substance is more culpable, her crime more "greatly serious," than the person who intended to do—and in fact may have

4

already accomplished—the very same thing. But under the majority's view, because the person who intended to sell or distribute was arrested *before or after* she had the opportunity to fulfill her intent, she is not subject to the sentencing implications of a per se grave or serious designation. I cannot grasp how the timing of the act of distribution can account for the difference in treatment between per se grave or serious and not.

¶82 The flaw in the majority's logic is best illustrated by a hypothetical. Under the majority's holding, a well-known drug dealer who is planning to sell hundreds of pounds of an illegal drug but gets caught prior to actually selling it would be charged with possession with intent to distribute, whereas a one-time seller who completes a transaction selling a small amount of the same drug but is caught in the act would be charged with distribution. By the majority's logic, the well-known drug dealer's offense is not per se grave or serious, but the one-time seller's is. That result is inequitable and illogical. In both cases, it is the underlying intent to distribute illegal drugs—and not whether that intent was actually completed—that is grave or serious.

¶83 Because I believe that we cannot and should not draw such a fine line between the sale or distribution of drugs and the possession with intent to sell or distribute drugs, I cannot support the majority's holding that possession with intent to sell or distribute should no longer be deemed per se grave or serious.

Here, because two of Wells-Yates's predicate convictions were for simple possession—and because I agree with the majority that such offenses are not per se grave or serious, and that a trial court should consider ameliorative legislation for the purposes of proportionality—I would remand for the trial court to conduct a new proportionality review (under the standard from our previous proportionality precedent for the reasons discussed in the dissent). Accordingly, while I agree with the rationale of the dissent, I concur in the majority's judgment only.

CHIEF JUSTICE COATS, dissenting.

¶84     Unlike the majority, I think it clear that the defendant's recidivist sentences in this case are not constitutionally disproportionate, a matter determinable by this court without regard for the analysis below, and I would therefore affirm without remand for further consideration.  Rather than limit itself to the sentence in this case, the proportionality of which I believe to pose no serious question, the majority attempts a global rewrite of our proportionality jurisprudence, reinterpreting controlling United States Supreme Court precedent and disputing in a number of critical respects our own prior guidance for applying it.  Because the Supreme Court has not found it necessary to parse any more finely the principles governing proportionality relative to sentences to terms of years, and because this court has largely been able to appropriately reject the proportionality challenges with which it has been faced in any event, I have not previously found it necessary to write in this area.  Because, however, the majority writes so broadly today, criticizing and at several points overturning propositions long accepted by this court, and because it considers itself unable at this stage to simply declare the defendant's sentence constitutional, I feel compelled to briefly express my different understanding of the principles governing non-capital, constitutional proportionality review.  I therefore respectfully dissent and write separately.

¶85     As an initial matter, I note that the majority dismisses as inconsequential what I consider to be the single most direct and important Supreme Court authority concerning constitutional proportionality limitations governing recidivist sentencing. *See Ewing v. California*, 538 U.S. 11 (2003) (O'Connor, J., concurring). For the same reasons we, and most other jurisdictions, have accepted the opinion of Justice Kennedy as the "rule," or controlling authority, of *Harmelin v. Michigan*, 501 U.S. 957 (1991), the opinion authored by Justice O'Connor represents the controlling authority of *Ewing*. *See Marks v. United States*, 430 U.S. 188, 193 (1977); *see also Close v. People*, 48 P.3d 528, 535, 537 (Colo. 2002). And just as *Harmelin* represents the Court's latest statement concerning proportionality in non-capital sentencing generally, and non-recidivist sentencing in particular, *Ewing* represents the Court's latest statement concerning recidivist sentencing. While making clear that it is "guided by" the proportionality principles distilled in Justice Kennedy's opinion in *Harmelin*, the controlling opinion in *Ewing* also acknowledges for the first time that along with the sentencing goals of deterrence and retribution, which warranted the life without parole sentence for drug dealing in *Harmelin*, incapacitation, as another appropriate legislative sentencing goal, must be considered in the balance of gravity and harshness in what the *Ewing* Court terms "the new context" of recidivist sentencing implicated in that case. *Ewing*, 538 U.S. at 23–25.

2

¶86    *Harmelin* had already made clear that controlling principles of proportionality review require both that substantial deference be shown to legislatures, which necessarily possess broad authority in determining the types and limits of punishment for crime, and that any such review must be informed by objective factors to the maximum extent possible.  501 U.S. at 998–99.  Finding a relative lack of objective standards to distinguish between sentences for different terms of imprisonment imposed by legislation, the Court therefore concluded that such sentences are reviewable only for *gross* disproportionality and, in fact, that the possibility of successful challenges to the proportionality of particular prison sentences must therefore be *exceedingly* rare.  *Id.* at 1001 (quoting *Solem v. Helm*, 463 U.S. 277, 289–90 (1983)).  Unlike *Harmelin*, which addressed gravity and harshness with respect to a particular offense, *Ewing* made clear that in recidivist sentencing the question of gravity must include consideration of not only the defendant's current offense but also his criminal history as a whole, and that the state has a legitimate interest not only in punishing for the "triggering" offense but also "in dealing in a harsher manner with those who by repeated criminal acts have shown that they are simply incapable of conforming to the norms of society as established by its criminal law."  *Ewing*, 538 U.S. at 29 (quoting *Rummel v. Estelle*, 445 U.S. 263, 276 (1980)).

¶87    Both *Harmelin* and *Ewing*, however, made clear that the controlling question for purposes of proportionality review is simply whether the legislature had a "reasonable," or "rational," basis for choosing the sentence it did: With regard to the drug conviction in *Harmelin*, the question was whether "the Michigan legislature could with reason conclude that the threat posed to the individual and society by possession of this large an amount of cocaine . . . is momentous enough to warrant the deterrence and retribution of a life sentence without parole," 501 U.S. at 1003; and for the recidivist sentence in *Ewing*, whether "the State of California has a reasonable basis for believing that dramatically enhanced sentences for habitual felons 'advance[s] the goals of [its] criminal justice system in any substantial way,'" 538 U.S. at 28 (quoting *Solem*, 463 U.S. at 297 n.22).  In each case the Court found that the respective legislature could and did.  *Ewing*, 538 U.S. at 30–31; *Harmelin*, 501 U.S. at 1008–09.

¶88    The controlling opinion in *Ewing* distinguished the result in *Solem*, in which the Court found a recidivist sentence to be unconstitutionally disproportionate, from that in *Rummel*, in which the Court found no disproportionality, not on grounds that either the triggering or prior offenses in the former case were less serious, but solely on the ground that the sentence at issue in *Solem*, unlike that in *Rummel*, did not permit discretionary release to parole.  *Ewing*, 538 U.S. at 22 (citing *Solem*, 463 U.S. at 297).  The *Ewing* Court therefore held that a sentence of twenty-

4

five years to life in prison, imposed under California's three strikes law for the offense of felony grand theft, despite the sentencing court's discretion to classify it as only a misdemeanor, was not grossly disproportionate. *Id.* at 30–31. The defendant in this case was sentenced for felony possession with intent to sell methamphetamine, following three prior convictions for felony possession or possession with intent to sell the same illegal drug, to a mandatory term of imprisonment with parole eligibility after serving fewer than thirty years, as well as felony identity theft following the same three prior convictions, to a mandatory term of imprisonment with parole eligibility after serving fewer than ten years. *See Ankeney v. Raemisch*, 2015 CO 14, ¶ 12, 344 P.3d 847, 850–51. I believe no further analysis or finding is necessary to mandate a determination by this court that the legislature had a rational basis to believe incapacitation of a person committing this number of such felonies, seriatim—each following conviction for the last— would advance the goals of our criminal justice system by incapacitating the defendant for the prescribed number of years.

¶89 I therefore consider the majority's substantial revision of the applicable standards for a constitutional proportionality review to be not only unnecessary but in fact highly problematic. While I agree that our understanding of the constitutional requirement of proportionality in non-capital sentencing has not always been either clear or consistent, and has in fact morphed to accommodate

different sentencing questions and the often-changing and cryptic dictates of the Supreme Court, I do not agree with the majority's characterization of either our or the Supreme Court's prior pronouncements in this area, or the majority's extension of those pronouncements to the consideration of legislative amendments to the classification and sentencing schemes involved in this case. Although my disagreements with the majority are more fundamental and therefore impact much of both its reasoning and conclusions, I believe our differences stem in large part from our different understandings of the role and determination of the gravity and seriousness of offenses and what appears to me to be the majority's reluctance to defer to the rational choices of the legislature concerning terms of imprisonment.

¶90 The majority enumerates five reasons why it considers "problematic" the "view" expressed in *People v. Gaskins*, 825 P.2d 30 (Colo. 1992), and subsequent cases, concerning the adequacy of an abbreviated review when the supporting offenses are grave or serious, with virtually all of which I disagree. Maj. op. ¶ 26. In this regard, I understand *Gaskins* to have held that an abbreviated review was sufficient to determine that the offenses supporting the defendant's recidivist sentence in that case were not so lacking in gravity or seriousness as to suggest that a life sentence allowing for the possibility of parole was constitutionally disproportionate. *Gaskins*, 825 P.2d at 36. Rather than implying that the harshness

6

of the penalty could be disregarded, we clearly indicated that any habitual criminal sentence supported by the named offenses to a term of years that includes eligibility for parole would not be grossly disproportionate. *See id.* at 37. Our subsequent cases of *Close* and *People v. Deroulet*, 48 P.3d 520 (Colo. 2002), which actually addressed the question whether a defendant would even be entitled to a proportionality review of crime of violence or habitual criminal sentences in this jurisdiction, are best understood as simply acknowledging that although no penalty is per se constitutional, virtually any recidivist sentence to a term of years for those crimes already found to be sufficiently grave or serious in *Gaskins* will be nearly impervious to a proportionality challenge. *See Close*, 48 P.3d at 538; *Deroulet*, 48 P.3d at 526–27. In the absence of an inference of gross disproportionality having been the result of an abbreviated review alone, *Harmelin* made clear that such an abbreviated review was all that was required.

¶91 It appears to me that the majority's demand for a balance of gravity and harshness in every case evidences a failure to heed *Harmelin*'s admonition that the lack of clear objective standards to distinguish between sentences for different terms of years and mandatory deference to rational legislative choices precludes judicial findings of all but gross disproportionality. Rather, the "exceedingly rare" circumstance in which a term of years could successfully be challenged as disproportionate, *see Harmelin*, 501 U.S. at 1001, is limited to an exceedingly, and

7

necessarily, long term of years imposed for crime that is neither violent, grave, nor serious, in the sense that it amounts to no more than malum prohibitum or "one of the most passive felonies a person could commit," *id.* at 1002 (quoting *Solem*, 463 U.S. at 296). In its last word on recidivist sentencing and justification of such sentences in terms of incapacitation, the Supreme Court distinguished *Rummel*, in which it upheld a recidivist sentence against a proportionality challenge, from *Solem*, in which it did not, solely on the ground that the life sentence in the former allowed for the possibility of parole while the life sentence in the latter did not. *Ewing*, 538 U.S. at 22. Emphasizing that *Solem* expressly declined to overrule *Rummel*, the *Ewing* Court further recounted with favor that Mr. Rummel was sentenced to a lengthy prison term for felony theft of $120.75 by false pretenses, after having been convicted of no more than fraudulent use of a credit card to obtain $80 worth of goods and services and of passing a forged check in the amount of $28.36. *Ewing*, 538 U.S. at 21–23. Finally, *Ewing* recounted that the *Rummel* Court offered, by way of example, that the proportionality principle would come into play if a legislature were to make overtime parking a felony punishable by life imprisonment, and that the *Rummel* Court, by contrast, upheld the mandatory life sentence being challenged in that case against an Eighth Amendment challenge. *Ewing*, 538 U.S. at 21.

¶92 The majority's unwillingness to concede that possession of illegal drugs, much less possession with intent to sell illegal drugs, necessarily amounts to a serious crime for purposes of proportionality review demonstrates the extent to which I believe it fails to appreciate the limited nature of the crimes considered by the Supreme Court to be other than serious and, correspondingly, the limited nature of the role of proportionality review in non-capital sentencing. The *Harmelin* controlling opinion explains in great detail why the possession, use, and distribution of illegal drugs represent not only a serious crime but in fact one of the greatest problems affecting the health and welfare of our population. 501 U.S. at 1002–03. It not only notes the pernicious effects on the individual who consumes illegal drugs, but also finds a direct nexus between illegal drugs and crimes of violence, expressly enumerating at least three ways in which the "use" of illegal drugs relates to the commission of crime: 1) drug users may commit crime because of drug-induced changes in physiological functions, cognitive ability, and mood; 2) drug users may commit crime in order to obtain money to buy drugs; and 3) a violent crime may occur as part of the drug business or culture. *Id.* I view the majority's demand that the individual circumstances surrounding the commission of possession or possession with intent to sell illegal drugs be a necessary consideration in determining whether a particular defendant's crime of possession or possession with intent to sell is serious as clear evidence of the extent

to which it is willing to second-guess legislative judgments concerning sentences to terms of years in general, and the merits of incapacitating defendants who remain undeterred from committing drug felonies in particular.

¶93 Finally, with regard to the effect of subsequent legislative amendments on the sentencing scheme—the central question on which the defendant's challenge rests—I believe the majority has simply lost sight of the object of the inquiry. With regard to recidivist sentencing in particular, the controlling opinion in *Ewing* makes clear that for purposes of proportionality it was enough that the California legislature had a reasonable basis for believing that the dramatically enhanced sentences of its three-strikes law advanced the goals of its criminal justice system, not least among which is the incapacitation of those who have demonstrated that they are incapable of conforming to the norms of society. 538 U.S. at 28–29. By expressly making "prospective only" particular ameliorative amendments to a recidivist sentencing scheme—whether that be by reducing the penalty for some predicate offenses or by eliminating some crimes from the category of predicate offenses altogether—the legislature has made clear its judgment that the inability or unwillingness of those previously convicted to conform their conduct to the norms of society reflected in the criminal law, as that law existed at the time it was violated, continues to merit incapacitation by enhanced punishment.

¶94 Quite apart from the fact that the legislature has not relegated the drug crimes at issue in this case to the status of mere regulatory offenses or offenses more minor even than those for which a lengthy prison term was upheld in *Rummel*, and therefore that it would have been inconsequential for proportionality purposes even if the legislature had made its amendments retroactive, unless it lacked a rational basis for doing so, it was for the legislature to make the judgment that the need for incapacitation of the defendant should be based on her failure to conform to the norms of society as reflected in the criminal law at the time she violated it. *See Ewing*, 538 U.S. at 28–29. While courts must of course account for legislation in effect at the time of sentencing, unless the legislature lacked a rational basis for not altering its prior judgment about the need for habitual criminal sentencing by making any subsequent ameliorative legislation retroactive, the proportionality of such habitual criminal sentences could not be affected in any way by the new legislation.

¶95 It is well established that legislatures do not lack a rational basis for, and principles of equal protection are therefore in no way violated by, penalizing violators of the same criminal proscription differently, as long as such violators committed their crimes during different time periods. *Sperry & Hutchinson Co. v. Rhodes*, 220 U.S. 502, 505 (1911) ("[T]he 14th Amendment does not forbid statutes and statutory changes to have a beginning, and thus to discriminate between the

11

rights of an earlier and later time."); *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 505–06 (6th Cir. 2007) (employing rational basis review and finding no equal protection violation where Michigan prospectively amended its sex offender registration law, effectively creating pre-amendment and post-amendment offender classes); *Ex parte Zimmerman*, 838 So. 2d 408, 412 (Ala. 2002) (upholding prospective application of ameliorative sentencing legislation, citing state's legitimate interests in maintaining the finality of judgments and assuring that penal laws will maintain their desired deterrent effect by carrying out original prescribed punishment as written); *People v. Floyd*, 72 P.3d 820, 827 (Cal. 2003) (rejecting defendant's assertion that prospective legislation fails rational basis review and noting state's legitimate interests in ensuring "penal laws will maintain their desired deterrent effect by carrying out the original prescribed punishment as written").

¶96 To the extent the majority intends that ameliorative legislation expressly made prospective only is nevertheless relevant to the question whether a habitual criminal sentence, based on crimes to which that legislation was expressly made inapplicable, is constitutionally disproportionate, I therefore strongly disagree.

¶97 I therefore respectfully dissent.